UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X
                                              :

KATHLEEN VALENTINI et al.,            :

                       :

               Plaintiffs,         :          20 Civ. 9526 (JPC)

                       :

     -v-                     :         OPINION AND ORDER

                       :

GROUP HEALTH INCORPORATED et al.,    :

                       :

              Defendants      :

                       :

-------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

       Defendant insurance company Group Health Incorporated ("GHI") contracts with Defendant CareCore National LLC d/b/a eviCore ("eviCore") to undergo a process called utilization review to determine if a requested health service is "medically necessary." If a service is deemed not medically necessary, GHI can decline to pre-authorize the service, *i.e.*, decline to cover its cost. This case concerns the liability of Defendants GHI, GHI's parent company, Emblem Health ("Emblem"), and eviCore for declining to pre-authorize an MRI for Kathleen Valentini ("Kathleen") that her doctor had prescribed. Plaintiffs Valerio Valentini, Valerio Valentini on behalf of his minor son M.V., and Estate of Kathleen Valentini, with Valerio Valentini as Administrator,[1] bring this suit against GHI, Emblem, eviCore, and John Does 1 and 2, alleging various tort, fraud, and contract claims. Dkt. 1 at 9-30 ("Compl."). Defendants have moved to dismiss the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the

---

[1] On February 2, 2021, the Court granted Valerio Valentini's motion to substitute "Estate of Kathleen Valentini, Valerio Valentini as Administrator," as a named Plaintiff in place of Kathleen Valentini on account of her death on November 1, 2020. Dkt. 48.

following reasons, the Court grants Defendants' motions to dismiss, but grants Plaintiffs leave to amend their Complaint with respect to their fraud, conspiracy, and derivative claims.

## I.  Background

### A.  Consideration of Materials Outside the Complaint

The Court first addresses, as a threshold issue, what materials it may consider at this stage. In considering a motion to dismiss under Rule 12(b)(6), a court may consider not only the facts alleged in the complaint, but also "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, . . . and documents possessed by or known to the plaintiff upon which it relied in bringing the suit." *Tongue v. Sanofi*, 816 F.3d 199, 209 (2d Cir. 2016) (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)). "Where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (quoting *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006)).  "[M]ere notice or possession," however, "is not enough." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 231 (2d Cir. 2016) (internal quotation marks omitted); *accord Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) ("[W]e reiterate here that a plaintiff's *reliance* on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough.").  In addition, there cannot be any dispute "regarding the authenticity or accuracy," *Nicosia*, 834 F.3d at 231 (quoting *DiFolco*, 622 F.3d at 111), or "relevance of the document[s]" to be considered, *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006).

Defendants ask the Court to consider two sets of documents.  First, they ask the Court to

consider the GHI Comprehensive Benefits Plan, including the Certificate of Insurance that sets forth the terms of Kathleen's insurance coverage.   Dkt. 31 ("Wohlforth Certification" or "Wohlforth Cert."), Exh. A ("Policy").   Defendants assert that "the GHI Certificate of Insurance is essential to the Complaint, as it sets forth the contractual obligations that Plaintiffs are seeking to enforce, including through a breach of contract claim," and it "is quoted, referenced, and extensively relied on in the Complaint."   Dkt. 30 ("eviCore Motion") at 2 n.1 (citing Compl. ¶¶ 45-49).[2]   The Court agrees.   The Policy was both incorporated into and integral to the Complaint. *See Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004) (finding that the plaintiff's complaint incorporated by reference two documents that it "explicitly refer[ed] to and relie[d] upon" to establish the plaintiff's claim).   In fact, "courts within this Circuit routinely consider copies of relevant policy documents in connection with insurance disputes." *Pastor v. Woodmere Fire Dist.*, No. 16 Civ. 892 (ADS) (ARL), 2016 WL 6603189, at *4 (E.D.N.Y. Nov. 7, 2016) (collecting cases); *Strom v. Goldman, Sachs & Co.*, 202 F.3d 138, 140 n.1 (2d Cir. 1999) ("The court below explicitly and correctly considered the group policy on the theory that it had been incorporated by reference in the complaint."), *overruled on other grounds*, *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204 (2002).   The Complaint references the Policy numerous times, and the Policy forms the basis of Plaintiffs' contractual claims.

Second, Defendants ask the Court to consider "true and correct copies of written communications between eviCore, [Kathleen], and [Dr. Barry Oliver, Kathleen's treating physician], pertaining to the pre-authorization request, including the supporting documentation submitted by Dr. Oliver."   eviCore Motion at 3 n.2.   These purported written communications are

---

[2] GHI and Emblem have joined and adopted the eviCore Motion.   *See* Dkt. 17 at 1; Dkt. 61 at 1.

attached as Exhibits to the Wohlforth Certification. *See* Wohlforth Cert., Exhs. B, C, D, E, F. Specifically, they request that the Court consider: Exhibit B, "a true and correct copy of the February 11, 2019 letter sent from eviCore to [Kathleen] and her treating physician;" Exhibit C, "a true and correct copy of the February 13, 2019 facsimile correspondence sent from the office of [Kathleen]'s treating physician to eviCore;" Exhibit D, "a true and correct copy of the February 16, 2019 letters sent from eviCore to [Kathleen] and her treating physician;" Exhibit E, "a true and correct copy of the February 20, 2019 facsimile correspondence sent from the office of [Kathleen]'s treating physician to eviCore;" and Exhibit F, "a true and correct copy of the March 7, 2019 letters sent from eviCore to [Kathleen]."  Wohlforth Cert. ¶¶ 3-7.  They contend that these documents are "integral to the Complaint, as they are extensively referenced, and include the primary factual basis for Plaintiffs' claims and theories."  eviCore Motion at 3 n.2 (citing Compl. ¶¶ 1-2, 4-6, 8, 20, 24-30, 32-34, 67, 79-80, 114, 135).

The Complaint does not directly reference most of these communications, nor is it clear that Plaintiffs relied upon them in drafting the Complaint.  The Complaint does not reference Exhibit B, which purports to be a communication from eviCore and Emblem to Kathleen and Dr. Oliver, dated February 11, 2019, or otherwise acknowledge its existence.  Nor does the Complaint make reference to Exhibits C and E, which appear to be communications from Dr. Oliver's office to eviCore on February 13, 2019 and February 20, 2019, respectively.  Although the Complaint alleges that "Dr. Oliver's office contacted GHI immediately after Kathleen's visit" on February 4, 2019, Compl. ¶¶ 28-29, and that Dr. Oliver "immediately appealed the [Defendants'] denial of the MRI," *id.* ¶ 8, it does not detail the form, type, or dates of those communications.  *Cf. DiFolco*, 622 F.3d at 112 ("Because DiFolco referred in her complaint to her e-mails to Kaplan of August 23, 2005, and August 24, 2005, the District Court could deem them incorporated in the complaint

and therefore subject to consideration in its review of the adequacy of the complaint.").  In fact, it is not even clear that Plaintiffs had notice of the exact contents of these communications, given that they appear to have been drafted by Dr. Oliver.  Similarly, the Complaint does not reference Exhibit F, which appears to consist of letters dated March 7, 2019 that eviCore sent to Kathleen. While Kathleen would have had notice of these letters, given that she was the recipient, there is no reference to these letters in the Complaint.  The Court therefore cannot conclude that Plaintiffs "relied" on these documents while drafting the Complaint.  *See DeLuca v. AccessIT Grp., Inc.*, 695 F. Supp. 2d 54, 60 (S.D.N.Y. 2010) (finding that extraneous documents were not integral to the complaint because the complaint did not quote from them or rely heavily upon the documents' terms and effects); *Tammaro v. City of New York*, No. 13 Civ. 6190 (WHP), 2018 WL 1621535, at *4 (S.D.N.Y. Mar. 30, 2018) ("Because [the plaintiff] cannot be said to have 'rel[ied] on the terms and effect of [the voucher(s)] in drafting the complaint,' the mere fact that he may have had notice or possession of the vouchers or that he mentioned the vouchers in the complaint is insufficient." (second and third alterations in original) (quoting *Chambers*, 282 F.3d at 153)). Accordingly, the Court declines to consider Exhibits B, C, E, and F, attached to the Wohlforth Certification, at this stage.

The Complaint does, however, directly reference Exhibit D, the February 16, 2019 letter from eviCore to Kathleen and her physician, Dr. Oliver, which was on joint eviCore and Emblem letterhead.  The Complaint alleges that "[o]n February 16, 2019, the GHI defendants overruled Dr. Oliver's recommendation and denied Kathleen this basic, medically appropriate diagnostic test." Compl. ¶ 4.  The Complaint also quotes from that letter, asserting that "the GHI defendants informed Kathleen that eviCore had determined that the MRI was 'not medically necessary,'" *id.*, and that "the GHI/eviCore denial included the statement, 'We have told your doctor about this,'"

*id.* ¶ 5; *see also id.* ¶¶ 33, 67, 80.  The Complaint further details the contents of the letter, including that "the GHI defendants stated that an MRI would be medically necessary only if Kathleen failed to improve after a six-week course of treatment such as 'ice', 'steroids', 'cross training', 'rest' or 'doctor prescribed treatment'."  *Id.* ¶ 5.  This letter was therefore both incorporated into and integral to the Complaint.  Accordingly, the Court will consider Exhibit D in deciding the motions.

**B.  The Insurance Policy**

As noted above, GHI contracts with eviCore to conduct pre-authorization utilization reviews to determine whether requested treatments are "medically necessary."  *Id.* ¶¶ 30-31; *see* Policy at 50 ("We review health services to determine whether the services are or were medically necessary or experimental or investigational ('Medically Necessary').  This process is called utilization review.").  The Policy specifically states that "GHI does not cover services unless they are medically necessary," which it defines as "health care services that are rendered by a Hospital or a licensed Provider and are determined by GHI to meet" certain enumerated criteria.  Policy at 7.  As is relevant here, the Policy states that "[a]ll determinations that services are not Medically Necessary will be made by: 1) licensed physicians; or 2) licensed, certified, registered or credentialed health care professionals who are in the same profession and same or similar specialty as the Provider who typically manages [the insured's] medical condition or disease or provides the health care service under review."  *Id.* at 51.  According to the Policy, "[i]n making a determination regarding medical necessity, GHI will examine [the insured's] treatment and [the insured's] condition," as well as the insured's "doctor's reasons for providing or prescribing the care, and any unusual circumstances."  *Id.* at 7.  The Policy specifies that "the fact that [the insured's] doctor prescribed or provided the care does not automatically mean that the care qualifies for payment under this Plan."  *Id.*

The Policy also outlines a timeline for GHI's review.  It states that if "we have all the information necessary to make a determination regarding a Preauthorization review, we will make a determination and provide notice to [the insured] and [his or her] Provider, by telephone and in writing, within three (3) business days of receipt of the request." *Id.* at 51.  It states that if "we need additional information, we will request it within three (3) business days," after which the insured or the insured's medical provider "will then have forty-five (45) calendar days to submit the information." *Id.*  Then, "[i]f we receive the requested information within forty-five (45) days, we will make a determination and provide notice to [the insured] and [his or her] Provider, by telephone and in writing, within three (3) business days of our receipt of the information." *Id.*

The Policy provides that if GHI "did not attempt to consult with [the insured's] Provider before making an adverse determination, [the insured's] Provider may request reconsideration by the same clinical peer reviewer who made the adverse determination." *Id.* at 52.  It specifies that "[f]or Preauthorization . . . review[], the reconsideration will take place within one (1) business day of the request for reconsideration," and that "[i]f the adverse determination is upheld, a notice of adverse determination will be given to [the insured] and [the insured's] Provider, by telephone and in writing." *Id.*  The Policy provides that the insured "may request an internal appeal of an adverse determination" within 180 days of receiving notice of the adverse determination, and that GHI will then decide the appeal within 30 days of receipt of the appeal request. *Id.* at 52-53.  The Policy allows for a separate course of action for expedited appeals. *Id.* at 53.

## C.  Facts

The facts of this case—which are taken from Plaintiffs' Complaint as well as the Policy and the February 16, 2019 letter and are presumed to be true for purposes of the motions to dismiss, *see Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 n. 1 (2002)—are undoubtably tragic.

On November 11, 2018, Kathleen visited her doctor, Dr. Steven Bauer, complaining of pain in her right hip. Compl. ¶ 24. Dr. Bauer recommended physical therapy and Naproxen, a pain killer sold over the counter as Aleve. *Id.* She completed several weeks of physical therapy but continued to experience pain. *Id.* ¶ 25. On January 28, 2019, she returned to Dr. Bauer, who referred her to an orthopedic surgeon. *Id.* ¶¶ 26-27. On February 4, 2019, Kathleen saw an orthopedic surgeon, Dr. Oliver, who ordered an MRI. *Id.* ¶ 28. Dr. Oliver sought pre-authorization for the MRI from Kathleen's medical insurance company, GHI. *Id.* ¶¶ 3, 29.[3]

Upon receipt of Dr. Oliver's request, GHI and eviCore conducted a utilization review. *Id.* ¶¶ 30-31. In a letter dated February 16, 2019, Defendants informed Kathleen and Dr. Oliver that they had denied the request for pre-authorization because they concluded that the requested MRI was not medically necessary, as Kathleen "had not yet demonstrated a failure to improve following a 6-week trial of treatment, which might include rest, drugs for pain, or workout program (*i.e.*, physical therapy)." *Id.* ¶¶ 32-33; *see* Wohlforth Cert., Exh. D. Kathleen had, however, completed a "full course" of physical therapy, which GHI had paid for, and a "full course" of pain medication. Compl. ¶¶ 34-35.

Dr. Oliver "immediately" appealed the denial, and "[s]ome 40 days later, [Defendants] reversed their denial only after speaking to [Dr.] Oliver on the phone." *Id.* ¶ 8. Kathleen received an MRI on March 14, 2019, which revealed that she had a sarcoma in her right hip. *Id.* ¶ 9.

---

[3] Kathleen's insurance plan, the Comprehensive Benefits Plan issued by GHI, is not subject to the Employee Retirement Income Security Act of 1974 ("ERISA"). Dkt. 43 ("Plaintiffs' First Opposition") at 4. As such, neither party disputes that ERISA does not preempt Plaintiffs' state law claims, as often occurs in similar medical insurance disputes. *See Montefiore Med. Ctr. v. Teamsters Local 272*, 642 F.3d 321, 327 (2d Cir. 2011) ("ERISA creates a comprehensive civil enforcement scheme that completely preempts any state-law cause of action that 'duplicates, supplements, or supplants' an ERISA remedy." (quoting *Aetna Health Inc. v. Davila*, 542 U.S. 200, 209 (2004)).

Kathleen was admitted to Memorial Sloan Kettering Hospital in New York, where "her treating physician" told her "in substance: had you come to us a month sooner, we could have used chemotherapy.  Now we can't; we have to amputate before we treat with chemo."  *Id.* ¶¶ 10-12.  The doctors amputated Kathleen's leg, hip, and pelvis, and found cancer nodules in her right lung.  *Id.* ¶¶ 11, 13.

Plaintiffs allege, upon information and belief, that John Does 1 and 2, "eviCore employees and physicians duly licensed to practice medicine, who determined that an MRI was not medically necessary," *id.* ¶ 20, "did not have appropriate medical expertise to render opinions concerning Kathleen's medical treatment," *id.* ¶ 37, "did not adequately review Kathleen's medical record," *id.* ¶ 38, "did not consult with any of Kathleen's physicians," *id.* ¶ 39, and "did not conduct a medical examination of Kathleen," *id.* ¶ 40.  The Complaint further alleges that, "by failing to review Kathleen's medical history and records, [Defendants] also ran afoul of applicable laws and regulations governing the 'utilization review' process."  *Id.* ¶ 42.

The Complaint also asserts that Defendants failed to comply with the procedures for utilization review as set forth in Kathleen's insurance policy.  Plaintiffs quote from a portion of the Policy covering utilization review:

> If we have all the information necessary to make a determination regarding Preauthorization review, we will make a determination and provide notice to [the insured] (or [the insured's] designee) and [the insured's] Provider, by telephone and in writing, within three (3) business days of receipt of the request.  If we need additional information, we will request it within three (3) business days.

*Id.* ¶ 46; *see* Policy at 51.  The Complaint states that Defendants had all of the necessary information required to authorize the MRI, "did not claim not to have the necessary information about Kathleen's or the doctor's prescription," and "did not utilize the three-day inquiry period to seek that information before denying authorization for Kathleen's MRI."  Compl. ¶¶ 47-48.

The Complaint seeks to tie Kathleen's experience to a broader scheme:  The Complaint

asserts that Defendants' conduct is part of "a deliberate pattern and practice of rendering negligent medical advice and causing patients not to receive medically necessary and timely treatment." *Id.* ¶ 44. In support, the Complaint lists several statements from the eviCore website "concerning eviCore's alleged commitment to 'mak[ing] sure the patient gets the right procedure.'" *Id.* ¶ 50 (alteration in original); *see id.* ¶¶ 51-52. Plaintiffs contend that these statements "appear designed to mislead patients such as Kathleen into believing that [D]efendants employ qualified medical professionals who undertake appropriate medical reviews and who will ensure their patients receive appropriate medical treatment." *Id.* ¶ 53. Plaintiffs assert that, in fact, Defendants "appear to be engaged in a systemic effort to delay or block necessary medical treatments and services and defeat their contractual obligations." *Id.* ¶ 54. The Complaint further references a letter from the Minnesota Hospital Association to the Minnesota Attorney General and Commissioners of Health and Commerce, "request[ing] 'immediate action' to address eviCore's misconduct." *Id.* ¶¶ 55-56. It also cites to a case in which GHI determined that an MRI was not medically necessary for another individual, who later learned that she had a tumor, which caused permanent spinal damage and paralysis. *Id.* ¶ 57. The Complaint asserts that these allegations reflect a scheme of "eviCore's habitual and blatant disregard for patients." *Id.* ¶ 59.

**D. Procedural History**

On October 6, 2020, Plaintiffs filed this action against GHI, GHI's parent company Emblem, eviCore, and John Does 1 and 2 in the Supreme Court of the State of New York, County of New York. *See id.* Plaintiffs bring ten causes of action: (1) negligence against all Defendants, *id.* ¶¶ 65-71; (2) medical malpractice against all Defendants, *id.* ¶¶ 72-86; (3) prima facie tort against all Defendants, *id.* ¶¶ 87-94; (4) breach of contract against GHI and Emblem Health, *id.* ¶¶ 95-103; (5) bad faith/punitive damages against GHI, Emblem Health, and eviCore, *id.* ¶¶ 104-

110; (6) breach of the implied covenant of good faith and fair dealing against GHI and Emblem Health, *id.* ¶¶ 111-118; (7) loss of services against all Defendants, *id.* ¶¶ 119-124; (8) loss of guidance to a minor child against all Defendants, *id.* ¶¶ 125-129; (9) fraud against all Defendants, *id.* ¶¶ 130-142; and (10) conspiracy to commit fraud against all Defendants, *id.* ¶¶ 143-148.[4] Plaintiffs have since abandoned their claim for prima facie tort. *See* Plaintiffs' First Opposition at 8 n.4.

On November 12, 2020, eviCore removed the action to this Court based on diversity of citizenship. *See* Dkt. 1 at 1-5. On December 16, 2020, GHI and eviCore moved to dismiss the Complaint. Dkts. 17, 18, 20 ("GHI Motion"), 23, 24, eviCore Motion.[5] On January 18, 2021, Plaintiffs filed a single opposition to both GHI's and eviCore's motions to dismiss, Plaintiffs' First Opposition, and on February 4, 2021, GHI and eviCore filed a joint reply, Dkt. 49. Although it initially denied that it had been served, Emblem eventually conceded service in February 2021, *see* Dkts. 1, 57, and moved to dismiss the Complaint on March 15, 2021, Dkts. 60, 61 ("Emblem Motion"). Plaintiffs' filed their opposition to Emblem's motion on April 15, 2021, Dkt. 65 ("Plaintiffs' Second Opposition"), and Emblem filed its reply on May 6, 2021, Dkt. 66.

## II. Discussion

### A. Legal Standard

In considering a motion to dismiss under Rule 12(b)(6), courts assess whether the

---

[4] The Complaint states that the seventh, eighth, and tenth causes of action are against "[a]ll defendants," and that the first, second, third, and ninth causes of action are against the "GHI defendants." But the Complaint defines the "GHI defendants" as GHI, Emblem, eviCore, and John Does 1 and 2, *i.e.*, all Defendants. Compl. ¶ 3. Accordingly, the Court assumes that Plaintiffs intended to bring each of these claims against all Defendants.

[5] Docket Numbers 17 and 18 are the unredacted versions of GHI and eviCore's briefs in support of their motions to dismiss, respectively. Docket Numbers 20 and 30 are redacted versions of those briefs, available on the public docket.

complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A complaint's "[f]actual allegations must be enough to raise the right to relief above the speculative level." *Twombly*, 550 U.S. at 555. In making such determination, the Court must "accept[] as true the factual allegations in the complaint and draw[] all inferences in the plaintiff's favor," *Biro v. Conde Nast*, 807 F.3d 541, 544 (2d Cir. 2015), but need not accept "legal conclusions" as true, *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

Where a claim sounds in fraud, a complaint must meet the heightened pleading standard of Rule 9(b) of the Federal Rules of Civil Procedure. Rule 9(b) requires that "a party must state with particularity the circumstances constituting fraud or mistake," although "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). In other words, Rule 9(b) requires pleading the circumstances of the fraud and the defendant's mental state. *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 171 (2d Cir. 2015). As to the circumstances, the complaint must "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *Id.* (quoting *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 187 (2d Cir. 2004)). In terms of a defendant's mental state, the complaint must allege facts "that give rise to a strong inference of fraudulent intent." *Id.* (quoting *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290-91 (2d Cir. 2006)). Courts view the alleged facts "in their totality, not in isolation." *Id.* (citation omitted).

**B. Analysis**

**1. Plaintiffs' Negligence Claim**

The parties do not dispute that New York law applies in this case, and the Court accordingly applies that law. *See Krumme v. Westpoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000) ("The parties' briefs assume that New York law controls, and such 'implied consent . . . is sufficient to establish choice of law.'" (alteration in original) (quoting *Tehran-Berkeley Civ. & Env't Eng'rs v. Tippetts-Abbett-McCarthy-Stratton*, 888 F.2d 239, 242 (2d Cir. 1989))). The role of a federal court sitting in diversity is to "carefully predict how the state's highest court would resolve" any "uncertainties" in state law, giving "the fullest weight to pronouncements of the state's highest court" and "proper regard to relevant rulings of the state's lower courts." *Runner v. N.Y. Stock Exch., Inc.*, 568 F.3d 383, 386 (2d Cir. 2009) (quoting *Travelers Ins. Co. v. Carpenter*, 411 F.3d 323, 329 (2d Cir. 2005)), *certified question accepted*, 12 N.Y.3d 892 (2009), *and certified question answered*, 13 N.Y.3d 599 (2009).

Under New York law, "to prevail on a negligence claim, 'a plaintiff must demonstrate (1) a duty owed by the defendant to the plaintiff, (2) a breach thereof, and (3) injury proximately resulting therefrom.'" *Pasternack v. Lab'y Corp. of Am. Holdings*, 27 N.Y.3d 817, 825 (2016) (quoting *Solomon v. City of New York*, 66.NY.2d 1026, 1027 (1985)). Whether or not a defendant owes a duty, as well as the scope of any such duty, is a question of law. *See id.* "In the absence of a duty, as a matter of law, there can be no liability." *Id.*

The existence of a contract between parties does not, in all instances, preclude a tort claim: A "defendant may be liable in tort when it has breached a duty of reasonable care distinct from its contractual obligations, or when it has engaged in tortious conduct separate and apart from its failure to fulfill its contractual obligations." *N.Y. Univ. v. Cont'l Ins. Co.*, 87 N.Y.2d 308, 316

(1995).  However, "where a party is merely seeking to enforce its bargain, a tort claim will not lie."  *Id.*

While "the line separating tort and contract claims may be elusive," New York courts look to the parties' relationship, nature of the injury, manner in which the injury occurred, and the resulting harm.  *Sommer v. Fed. Signal Corp.*, 79 N.Y.2d 540, 551-52 (1992).  In determining whether there is a duty, courts assess "the reasonable expectations of [the] parties and society generally, the proliferation of claims, the likelihood of unlimited or insurer-like liability, disproportionate risk and reparation allocation, and public policies affecting the expansion or limitation of new channels of liability."  *Pasternack*, 27 N.Y.3d at 825 (quoting *532 Madison Ave. Gourmet Foods v. Finlandia Ctr.*, 96 N.Y.2d 280, 288-89 (2001)).  They also consider the "convenience of administration, capacity of the parties to bear the loss, a policy of preventing future injuries, [and] the moral blame attached to the wrongdoer."  *Davis v. S. Nassau Cmtys. Hosp.*, 26 N.Y.3d 563, 576-77 (2015) (alteration in original) (quoting Prosser & Keeton, Torts § 53 at 359 (5th ed. 1984)).

The New York Court of Appeals expounded upon this in *Sommer*.  In that case, the New York Court of Appeals held that a building owner could bring both breach of contract and negligence claims against a fire alarm company for the company's purportedly negligent failure to notify the fire department of a four-alarm fire.  *Sommer*, 79 N.Y.2d at 548-49, 552.  It found that the company's "duty to act with reasonable care is not only a function of its private contract . . . but also stems from the nature of its services."  *Id.* at 552.  The New York Court of Appeals emphasized that New York City's "comprehensive scheme of fire-safety regulations requires certain buildings . . . to have central station fire service," and the City penalizes central station operators for, among other things, failing to transmit alarm signals.  *Id.*  "Fire alarm companies

thus perform a service affected with a significant public interest; failure to perform the service carefully and competently can have catastrophic consequences."  *Id.* at 553.

However, as the parties recognize, the New York Court of Appeals has never recognized a duty "between an insured seeking payment for medical services, and third-parties contracted to conduct utilization review at the request of a health insurer."  eviCore Motion at 8; *see* Plaintiffs' First Opposition at 15.  Nonetheless, Plaintiffs assert that New York courts would find that Defendants owed Kathleen a duty because Defendants "chose to set themselves up as the gatekeepers and decision-makers for Kathleen's access to medical treatment," and because "there are few more important public interests than when companies render life-altering decisions about whether to provide essential diagnostic medical tests."  Plaintiffs' First Opposition at 10-11. Plaintiffs contend that "where specific non-patients will rely on the physician's work, New York law recognizes a duty."  *Id.* at 12.   In further support of their argument, Plaintiffs point to Defendants' control over Kathleen's treatment, their capacity to bear the loss in light of the extensive revenue they earn from premiums each year, and the need to "encourage Defendants and other insurers to either accept the recommendations of learned medical care providers or, at the very least, act responsibly when usurping that role."  Plaintiffs' Second Opposition at 7-8.

Plaintiffs also draw heavily upon a line of cases in which New York courts, relying primarily on *Sommer*, have held that certain professionals may owe a tort duty for high-risk activities.  Plaintiffs' First Opposition at 13-14; *see, e.g.*, *Trustees of Columbia Univ. in N.Y.C. v. Gwathmey Siegel & Assocs. Architects*, 601 N.Y.S.2d 116, 118 (App. Div. 1993) (holding that a construction manager could be liable in tort for faulty construction of a "facade for a tall building in a heavily trafficked public area of a college campus" because it was "so affected with the public interest that the failure to perform competently can have catastrophic consequences"); *N.Y. Cent.*

*Mut. Fire Ins. Co. v. Glider Oil Co.*, 936 N.Y.S.2d 815, 819-20 (App. Div. 2011) (holding that a gas provider could be liable in tort because of the explosive nature of gas and cataclysmic consequences that could result from mishandling gas); *Hydro Invs., Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 15-16 (2d Cir. 2000) (concluding that an engineering firm could be liable for professional malpractice for providing inadequate estimates of energy output for a hydroelectric plant).

But the New York Court of Appeals has been hesitant to expand *Sommer* into the realm of insurance law, emphasizing that "governing the conduct of insurers and protecting the fiscal interests of insureds is simply not in the same league as the protection of the personal safety of citizens." *N.Y. Univ.*, 87 N.Y.2d at 317. The Court of Appeals in *New York University* noted that, unlike the fire-safety regulations at issue in *Sommer*, the New York Insurance Law does not impose "a separate duty of reasonable care," and further explained that "[if] the statute does not permit a private right of action in favor of an insured, a fortiori, it cannot be construed to impose a tort duty of care flowing to the insured separate and apart from the insurance contract." *Id.* at 317-18.

In fact, at least one New York court has found that an insurer does not owe a duty of care to the insured in the context of pre-authorization review. In *Logan v. Empire Blue Cross & Blue Shield*, 714 N.Y.S.2d 119, 121-23 (App. Div. 2000), the plaintiffs sued their insurer because it declined to cover certain treatments for Lyme disease, on the basis that they were "experimental treatments" excluded from the category of "medically necessary" treatments covered by the plan. The court found that the insurer owned no duty in tort, as the plaintiffs were "'essentially seeking enforcement of the bargain' with [the insurer], *i.e.*, that [the insurer] should be compelled to pay for allegedly medically-necessary services prescribed by their treating physicians." *Id.* at 124 (quoting *Sommer*, 79 N.Y.2d at 552). And it is well-settled that "the decision of an intermediate

state court on a question of state law is binding on [a diversity court] unless [the court] find[s] persuasive evidence that the highest state court would reach a different conclusion." *Entron, Inc. v. Affiliated FM Ins. Co.*, 749 F.2d 127, 132 (2d Cir. 1984).

Plaintiffs attempt to distinguish *New York University* on the basis that the court there was concerned only with "fiscal interests," but did not provide "an invitation for *health* insurers and their agents to provide negligent medical advice . . . without fear of tort liability."  Plaintiffs' First Opposition at 20.  But there is no reason to read such a distinction into *New York University*, which made clear that "governing the conduct of insurers"—without any particular limitation—does not give rise to the safety concerns present in *Sommer*.  The court further emphasized that the provisions of the New York Insurance Law "are properly viewed as measures regulating the insurer's performance of its contractual obligations, as an adjunct to the contract," not sources of an independent duty.  *N.Y. Univ.*, 87 N.Y.2d at 317-18.

Nor are Plaintiffs' efforts to distinguish *Logan* persuasive.  Plaintiffs admit that "GHI had a right to ensure that it only paid for procedures covered by the Plan," Plaintiffs' First Opposition at 15, and that if "Dr. Oliver had prescribed an experimental treatment—as was the case in *Logan* . . .[,] *Defendants would have been acting within the contract to review the claim*," *id.* at 16 (emphasis added).  They attempt to distinguish *Logan* on the basis that "[a]n MRI is not an experimental treatment and it is expressly a covered service in the Plan: so basic and routine that it is featured on the second page of the summary of common treatments people seek."  *Id.* at 16-17.  But the Policy *does* give GHI the power to determine if a treatment is "medically necessary." Policy at 7.  It clearly states that "GHI does not cover services unless they are medically necessary," and outlines the process GHI undertakes in determining whether a procedure is medically necessary:  "GHI will examine [the insured's] treatment and [the insured's] condition,"

"[the insured's] doctor's reasons for providing or prescribing the care, and any unusual circumstances." *Id.* And while Plaintiffs contend that "once GHI determined that Dr. Oliver was prescribing an MRI[,] . . . it had an obligation to provide any authorization needed on a timely basis," Plaintiffs' First Opposition at 15, the Policy makes clear that "the fact that [the insured's] doctor prescribed or provided the care does not automatically mean that the care qualifies for payment under this Plan," Policy at 7. When viewed in this context, it is clear that Plaintiffs' argument is that, like in *Logan*, Defendants did not fulfill their contractual obligations. Therefore, at bottom, Plaintiffs' own arguments reflect that they are "'essentially seeking enforcement of the bargain' with [GHI], *i.e.*, that [GHI] should be compelled to pay for allegedly medically-necessary services prescribed by [her] treating physician[]," Dr. Oliver. *Logan*, 714 N.Y.S.2d at 124 (quoting *Sommer*, 79 N.Y.2d at 552).

There is another fundamental issue with Plaintiffs' theory of a duty: Kathleen did not rely on eviCore's review in a manner that would give rise to a duty. If liability is based on "some form of written misrepresentation or nondisclosure," the defendant must have "knowledge or its equivalent that" the person to whom he gives certain information "intends to rely and act upon it," and "the relationship of the parties must be such the one has the right to rely upon the other for information." *Eiseman v. State*, 70 N.Y.2d 175, 187-88 (1987) (quoting *Int'l Prod. Co. v. Erie R. Co.*, 244 N.Y. 331, 338 (1927)). The question of reliance is often relevant in determining if a treating physician owes a duty of care to a third party impacted by the physician's examination or treatment of a patient, when that treatment is conducted for the benefit of the patient. *See, e.g.*, *id.* at 188 (holding that where a physician conducts a physical examination of a patient "for the benefit of his patient, . . . the physician plainly owed a duty of care to his patient and to persons he knew or reasonably should have known were relying on him for this service to his patient" but not "the

community at large").  But it is also relevant in assessing whether a medical professional owes a duty of care to a patient when examining that patient for the benefit of a third party.  In such scenarios, New York courts are generally hesitant to find that the doctor owes a duty to that patient, absent a showing that the patient relied on the doctor's affirmative advice.

For instance, in *Violandi v. New York*, 584 N.Y.S.2d 842 (App. Div. 1992), the court held that a police department physician who examined an employee did not owe a duty to that employee.  The court emphasized that a "physician-patient relationship does not exist where the examination is conducted solely for the purpose or convenience or on behalf of an employer." *Id.* at 843.  Instead, to establish that relationship, "there must be something more than a mere examination." *Id.*; *see also Kingsley v. Price*, 80 N.Y.S.3d 806, 811 (App. Div. 2018) (finding that a doctor had no duty to disclose abnormal results on an x-ray conducted for the purpose of determining workers' compensation); *Durso v. City of New York*, 673 N.Y.S.2d 651, 651-52 (App. Div. 1998) (finding no duty even where, "[i]n the course of evaluating whether plaintiff's back injury disabled him from performing limited police duty, defendant police surgeon allegedly conferred with plaintiff's treating physicians, examined his records, ordered at least one diagnostic test, and on one occasion recommended that plaintiff not take a prescribed pain medication that made him nauseous").

And in *Petrosky v. Brasner*, 718 N.Y.S.2d 340 (App. Div. 2001), a case even more directly on point, the court declined to find that an insurance company had a duty to disclose the results of an examination conducted for the purpose of determining an individual's eligibility for life insurance.  The court concluded that "[w]hile liability might have been imposed upon defendants if they had affirmatively misled the prospective insured or foreseeably induced him to forgo otherwise necessary treatment," there was no liability there because the decedent was not

examined by a physician, was advised that the tests were for the application process and not for treatment, and there was no indication he relied upon the tests.  *Id.* at 343.[6]

The Third Circuit's reasoning in *Skelcy v. UnitedHealth Group Inc.*, 620 Fed. App'x. 136 (3d Cir. 2015), is also persuasive.  The court in *Skelcy* considered whether, under New Jersey law, a medical evaluation company and doctor who performed a peer review assessment on a patient owed a legal duty to that patient.  The court concluded that they did not, as there was no interaction between the patient and the insurance company, and there was no showing of reliance, at least "not the sort of reliance that New Jersey courts have protected in the past."  *Id.* at 144.  The court reasoned that "New Jersey courts protect[] a person's ability to safely rely on a physician's implied or express representations when making medical decisions, such as selecting an appropriate course of treatment."  *Id.*  But in the context of insurance review, the insured relies on the insurer's determination not "to help him understand his physical condition or determine an appropriate course of treatment" but rather "to help him get reimbursed for his desired course of treatment." *Id.*

While Plaintiffs attempt to frame Defendants' role as providing "negligent medical advice," *see, e.g.*, Plaintiffs' First Opposition at 16, 25, the Court cannot credit these conclusory allegations in the face of the clear language of the documents upon which Plaintiffs rely.  *See Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 607 F. Supp. 2d 500, 502 (S.D.N.Y. 2009) (explaining that if a "conclusory allegation in the complaint conflicts with a statement made in a document

---

[6] In *Landon v. Kroll Laboratory Specialists, Inc.*, 22 N.Y.3d 1 (2013), the Court of Appeals found that a drug testing laboratory could be liable in tort for providing an inaccurate drug test to an individual's employer.  But the Court of Appeals emphasized the limited nature of that duty, *see id.* at 7 ("The result we reach today is in keeping with that of several other jurisdictions to recognize a duty *in similar circumstances*, as well as that of certain federal courts concluding that New York would recognize such a duty." (citations omitted)), and this Court sees no reason to import this reasoning into the insurance context, particularly in light of the aforementioned cases.

attached to the complaint, the document controls and the allegation is not accepted as true"), *aff'd*, 671 F.3d 140 (2d Cir. 2011).  The Policy makes clear that Defendants' determination of "medical necessity" was made in the context of whether GHI would pay for the services, *see* Policy at 7, and the first paragraph of the February 16, 2019 letter explicitly stated that its purpose was to explain why GHI "decide[d] to deny coverage for a treatment or service," Wohlforth Cert., Exh. D at 2.  Although prospective utilization review may be "quasi-medical in nature," *Cicio v. Does*, 321 F.3d 83, 98 (2d Cir. 2003) (quoting *Danca v. Private Health Care Sys., Inc.*, 185 F.3d 1, 5 n. 5 (1st Cir. 1999)), *cert. granted, judgment vacated sub nom. Vytra Healthcare v. Cicio*, 542 U.S. 933 (2004), that does not mean that Defendants' determination of "medical necessity" can fairly be categorized as affirmative medical *advice*.

Therefore, the weight of New York case law, and the Third Circuit's persuasive reasoning in *Skelcy*, caution against finding a duty based on the facts of this case.  Defendants did not examine Kathleen directly and there are no non-conclusory factual allegations showing that they affirmatively provided medical advice.  Any reliance that Kathleen had on eviCore's determination was based on her willingness and ability to pay for treatment.  This does not give rise to a duty under New York law.  Accordingly, because the Court concludes that Defendants did not owe Kathleen a duty, the Court does not address Defendants' additional arguments that Plaintiffs have failed to adequately plead both breach and causation.

### 2.  Medical Malpractice Claim

"When the duty [owed to the plaintiff] arises from the physician-patient relationship or is substantially related to medical treatment, the breach gives rise to an action sounding in medical malpractice, not simple negligence."  *Mejia v. Davis*, No. 16 Civ. 9706 (GHW), 2018 WL 333829, at *10 (S.D.N.Y. Jan. 8, 2018) (citing *La Russo v. St. George's Univ. Sch. of Med.*, 936 F. Supp.

21

2d 288, 304 (S.D.N.Y. 2013), *aff'd*, 747 F.3d 90 (2d Cir. 2014)).  "In order to establish a prima facie case of medical malpractice, a plaintiff must prove (1) the standard of care in the locality where the treatment occurred, (2) that the defendant[s] breached that standard of care, and (3) that the breach of the standard was the proximate cause of injury."  *Pieter v. Polin*, 50 N.Y.S.3d 509, 510 (2017) (alteration in original) (internal quotation marks omitted).  A claim for medical malpractice must be based on conduct that "constitute[s] medical treatment or bear[s] a substantial relationship to the rendition of medical treatment."  *Karasek v. LaJoie*, 92 N.Y.2d 171, 175 (1998).  However, "liability for medical malpractice may not be imposed absent a physician-patient relationship, either express or implied, because 'there is no legal duty in the absence of such a relationship.'"  *Kingsley*, 80 N.Y.S.3d at 809 (quoting *Cygan v. Kaleida Health*, 857 N.Y.S.2d 869 (App. Div. 2008)).

"In the context of a physical examination conducted for the purpose of rendering an evaluation for a third party, such as an employer or insurer, an implied physician-patient relationship may arise if the physician either affirmatively treats the examinee or affirmatively advises the examinee as to a course of treatment."  *Badolato v. Rosenberg*, 890 N.Y.S.2d 85, 86 (App. Div. 2009).  "For affirmative advice to be actionable, the plaintiff must establish that the advice was incorrect, that it was foreseeable that the plaintiff would rely on the advice, and that the plaintiff detrimentally relied on the advice."  *Id.*

Here, Plaintiffs' medical malpractice claim fails because Kathleen did not have a physician-patient relationship with any of Defendants.  There is undoubtedly a medical *aspect* to prospective review.  *See Cicio*, 321 F.3d at 98-99.  But that does not automatically give rise to a physician-patient relationship.  As detailed above, the specialists and physicians at eviCore never spoke to Kathleen, let alone directly examined her.  *See* Compl. ¶ 40 ("[eviCore employees] did

not conduct a medical examination of Kathleen before rendering a medical decision concerning Kathleen's treatment."). They did not advise her as to the best course of treatment but rather conducted a utilization review "based on . . . clinical and medical information" prepared and submitted by Dr. Oliver. *Id.* ¶¶ 30, 32. Defendants then advised Kathleen and her doctor what treatments they deemed "medically necessary" under the Policy, *i.e.*, what they would pay for. Wohlforth Cert., Exh. D. With the absence of a doctor-patient relationship between Kathleen and Defendants, the Court dismisses Plaintiffs' medical malpractice claim.

### 3. Breach of Contract Claim against GHI and Emblem

"Under New York law, an action for breach of contract requires proof of (1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages." *First Invs. Corp. v. Liberty Mut. Ins. Co.*, 152 F.3d 162, 168 (2d Cir. 1998) (citation omitted). "In order to adequately plead a cause of action for breach of contract, . . . the complaint must allege the provisions of the contract that were allegedly breached." *Woodhill Elec. v. Jeffrey Beamish, Inc.*, 904 N.Y.S.2d 232, 233 (App. Div. 2010).

In the Complaint, Plaintiffs allege that "Defendants breached the contract by denying claims for medically necessary treatment," Compl. ¶ 97, that the "denial of the pre-authorization request . . . was wrong based on the very criteria that defendants purported to apply," *id.* ¶ 41, and that "Defendants simply ignored their own published procedures and the medical standard of care," *id.* ¶ 49. Although Defendants argue that Plaintiffs have not adequately alleged which provisions of the Policy Defendants breached, *see* GHI Motion at 3-6, the most generous reading of the Complaint is that GHI breached the Policy by failing to abide by the utilization review procedures outlined therein. This would arguably state a claim for breach of contract under New York law. *See Batas v. Prudential Ins. Co. of Am.*, 724 N.Y.S.2d 3, 5 (App. Div. 2001) ("Plaintiffs'

23

allegations that defendants did not conduct the utilization review procedures that they promised in their contracts state a cause of action for breach of contract.").

In opposition to GHI's and eviCore's motions to dismiss, however, Plaintiffs attach three new documents—(1) EmblemHealth's Summary Program Description, (2) the version of GHI's Summary of Benefits and Coverage they contend that they were provided when selecting their coverage, and (3) GHI's current Summary of Benefits and Coverage, *see* Plaintiffs' First Opposition, Exhs. G, H, I—and argue that "GHI/Emblem breached the contract by failing to meet its promises stated" in *those* materials, *id.* at 39.  First, it is not clear that these documents even constitute part of a contract.  *See id.*, Exh. G at 1 ("This is only a summary.  For more information about your coverage, or to get a copy of the complete terms of coverage, call 1-800-624-2414.").  Second, the Complaint makes no reference to these documents, let alone asserts a breach of contract theory based on them.  *See MacCartney v. O'Dell*, No. 14 Civ. 3925 (NSR), 2016 WL 815279, at *3 (S.D.N.Y. Feb. 29, 2016) ("[F]actual assertions raised for the first time in a plaintiff's opposition papers, including supporting affidavits and exhibits, are not properly considered by the Court on a motion to dismiss as that would constitute improper reliance on matters outside the pleadings." (internal quotation marks and brackets omitted)).

Regardless, neither theory can survive a motion to dismiss, as Plaintiffs have not alleged an injury that would support a claim for damages.  Under New York law, a "nonbreaching party may recover general damages which are the natural and probable consequence of the breach." *Kenford Co. v. Cty. of Erie*, 73 N.Y.2d 312, 319 (1989).  In order to impose further liability, however, "such unusual or extraordinary damages must have been brought within the contemplation of the parties as the probable result of a breach at the time of or prior to contracting." *Id.* (alterations in original) (internal quotation marks omitted); *accord Harris v. Provident Life &*

*Acc. Ins. Co.*, 310 F.3d 73, 80 n.3 (2d Cir. 2002).

"[I]nsurance contracts, by their very nature, limit the insured's damage remedy to the amount of coverage contracted for by the parties and paid for by the insured." *Cont'l Info. Sys. Corp. v. Fed. Ins. Co.*, No. 02 Civ. 4168 (NRB), 2003 WL 145561, at *4 (S.D.N.Y. Jan. 17, 2003). To find a defendant liable for consequential damages, a plaintiff must allege that "the specific injury was of a type contemplated by the parties at the time of contracting." *Id.* And, "in order to determine whether such damages were within the contemplation of the parties at the time of contracting, New York courts take into consideration whether there existed a specific provision in the policy itself permitting recovery for the loss." *Id.* (collecting cases).

Had Defendants declined to pay for an MRI, Plaintiffs might have been entitled to reimbursement for the cost of the MRI. In addition, at least one New York court has held that "restitution of premiums paid may be an appropriate remedy" in the event of "nonreceipt of promised health care." *Batas*, 724 N.Y.S.2d at 5. But it is undisputed that Defendants did pay for the MRI, even if they did so belatedly, and Plaintiffs have not alleged any additional out-of-pocket costs for which they are seeking reimbursement.

Plaintiffs' Complaint is instead premised on the fact that the MRI came too late and that Kathleen was harmed as a result. But Plaintiffs do not point to anything in the Policy, or any other facts, even suggesting that the Policy permitted recovery for this type of loss or any type of consequential damages more broadly. The parties clearly contemplated disputes about coverage, and Defendants provided a detailed process for appealing such disputes, including at an expedited pace, if necessary. *See* Policy at 56 ("If Your attending physician certifies that a delay in providing the service that has been denied poses an imminent or serious threat to your health[,] . . . you may request an expedited external appeal."). However, the Policy is devoid of any sort of "specific

provision . . . permitting recovery for the loss" in the event of a delay or improper coverage decision.  *Cont'l Info. Sys. Corp.*, 2003 WL 145561, at *4.

And to the extent that Plaintiffs allege they are owed damages from Defendants' bad faith, it is well-settled that "New York law does not permit the recovery of consequential damages, which are 'extra-contractual' in nature, owing to 'an insurer's bad faith' in honoring the policy."  *Cohen v. Narragansett Bay Ins. Co.*, No. 14 Civ. 3623 (PKC), 2014 WL 4701167, at *2 (E.D.N.Y. Sept. 23, 2014), *on reconsideration*, 2014 WL 6673846 (E.D.N.Y. Nov. 24, 2014).

The Court is required to follow New York law, which does not allow for consequential damages in the circumstances here.  The Court therefore dismisses Plaintiffs' breach of contract claim.

### 4. Breach of Implied Covenant of Good Faith and Fair Dealing

"[I]implicit in every contract is a covenant of good faith and fair dealing, which encompasses any promises that a reasonable promisee would understand to be included."  *N.Y. Univ.*, 87 N.Y.2d at 318 (citations omitted).  "Certainly, a reasonable insured would understand that the insurer promises to investigate in good faith and pay covered claims."  *Id.*  However, a claim for breach of the implied covenant must be dismissed "if it is duplicative of an insufficient breach of contract claim."  *Schandler v. N.Y. Life Ins. Co.,* No. 09 Civ. 10463 (LMK), 2011 WL 1642574, at *9 (S.D.N.Y. Apr. 26, 2011).  "Under New York law, claims are duplicative when both 'arise from the same facts and seek the identical damages for each alleged breach.'"  *Deutsche Bank Nat. Tr. Co. v. Quicken Loans Inc.*, 810 F.3d 861, 869 (2d Cir. 2015) (quoting *Amcan Holdings, Inc. v. Canadian Imperial Bank of Com.*, 894 N.Y.S.2d 47, 49-50 (App. Div. 2010)).

Here, the Complaint relies on the same facts for its implied covenant of good faith and fair dealing claim and its breach of contract claim.  *See* Compl. ¶ 116 (alleging that Defendants

breached the covenant of good faith and fair dealing because Kathleen "was denied the benefits of a contract to which she was entitled, and suffered damages"); *see also* Plaintiffs' First Opposition at 39 ("GHI/Emblem breached the contract by failing to meet its promises stated in the [Summary of Benefits and Coverage] and [Summary Program Description], and as detailed above.  This was also a breach of the duty of good faith and fair dealing that is implicit in every contract.").  The Court therefore dismisses this claim as duplicative of Plaintiffs' failed breach of contract claim.

### 5. Fraud and Conspiracy to Commit Fraud

Under New York law, a prima facie fraud claim ordinarily requires a showing that "(1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance."  *Spinelli v. Nat'l Football League*, 903 F.3d 185, 209 (2d Cir. 2018) (internal quotation marks omitted).  However, where, as here, a fraud claim arises from the identical set of facts giving rise to a breach of contract claim, a plaintiff must either "(i) demonstrate a legal duty separate from the duty to perform under the contract, or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract, or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages."  *Guilbert v. Gardner*, 480 F.3d 140, 148 (2d Cir. 2007) (quoting *Bridgestone/Firestone, Inc. v. Recovery Credit Serv., Inc.*, 98 F.3d 13, 20 (2d Cir. 1996)).

The Complaint alleges that Defendants made two principal types of material misstatements.  First, it alleges that Defendants committed fraud "when they denied Kathleen's MRI because she needed to have completed a course of physical therapy before approval of the MRI," which Defendants knew was fraudulent because "they approved the physical therapy."  Compl. ¶ 135.  Second, the Complaint states that Defendants committed fraud "when they stated

that they would cover diagnostic services such as MRIs and conduct utilization Reviews in a prescribed manner," *id.* ¶ 131, but "did not try to comply with the promises or procedures set forth in their Certificate of Insurance," *id.* ¶ 132.  The Complaint alleges that they "willfully intended to induce [Kathleen]'s reliance on Defendants' statements by promising insurance coverage for basic, essential diagnostic tests, and requiring [Kathleen] (and other similarly situated) members to seek pre-authorization for the procedures."  *Id.* ¶ 133.  In support, the Complaint cites a handful of quotes from eviCore's website regarding eviCore's desire to "make sure the patient gets the right procedure."  *See id.* ¶¶ 51-52.  The Complaint speculates that "[t]hese statements appear designed to mislead patients such as Kathleen into believing that defendants employ qualified medical professionals who undertake appropriate medical reviews and who will ensure their patients receive appropriate medical treatment," when "[i]n fact, the GHI defendants appear to be engaged in a systematic effort to delay or block necessary medical treatments and services and defeat their contractual obligations."  *Id.* ¶¶ 53-54.  Plaintiffs also reference other instances when others allegedly suffered from eviCore's misconduct.  The Complaint cites to a letter from the Minnesota Hospital Association to the Minnesota Attorney General and Commissioners of Health and Commerce to "request 'immediate action' to address eviCore's misconduct," *id.* ¶¶ 55-56, as well as the case of another patient who was injured after being told an MRI was not medically necessary, *id.* ¶ 57.

Neither form of "material misstatement" gives rise to a fraud claim.  The first allegation—that Defendants committed fraud "when they denied Kathleen's MRI because she needed to have completed a course of physical therapy before approval of the MRI," *id.* ¶ 135—is, at best, a grievance with Defendants' performance of the contract.  The New York Court of Appeals has made clear that, "[t]o the extent that [a] plaintiff alleges that defendants engaged in a 'sham'

investigation to perpetuate their allegedly fraudulent scheme, those allegations merely evidence plaintiff's dissatisfaction with defendants' performance of the contract obligations." *N.Y. Univ.*, 87 N.Y.2d at 319.  In fact, an investigation that "provide[s] an inadequate basis for defendants to deny plaintiff's claim . . . does not state a tort claim," and instead "merely raises a question for the fact finder determining the breach of contract claim." *Id.*

The second allegation—that Defendants committed fraud "when they stated that they would cover diagnostic services such as MRIs and conduct utilization Reviews in a prescribed manner," Compl. ¶ 131, but did not comply with their own promises or procedures, *id.* ¶ 132— falls well below the pleading standard of Rule 9(b).  Plaintiffs do not specify the statements they contend were false, the speaker, or where the statements were made. *See Loreley Fin. (Jersey) No. 3 Ltd.*, 797 F.3d at 171.  There are no facts suggesting that Kathleen reasonably relied on the statements on eviCore's website or any other statements Defendants may have made.  Finally, the Complaint fails to allege facts giving rise to an inference of fraudulent intent.  The Complaint conclusorily alleges that the statements "appear designed to mislead" patients such as Kathleen. Compl. ¶¶ 54-55.  But to state a claim for fraud, "[g]eneral allegations that defendant entered into a contract while lacking the intent to perform it are insufficient to support the claim." *N.Y. Univ.*, 87 N.Y.2d at 318.  Thus, Plaintiffs cannot base their fraud claim on "conclusory allegations that defendants were engaged in a scheme to receive premium payments without giving any benefit in return." *Id.* at 319.  And Plaintiffs' references to the Minnesota Hospital Association's request and another patient's experience with GHI do little to support their claim, as "no inference of fraudulent intent can be drawn in this case from the mere compilation of the experiences of other dissatisfied policyholders." *Id.*

In opposition to the motions to dismiss, Plaintiffs shift their theory, arguing that Defendants

committed fraud because their marketing materials and basic plan information did not inform potential customers that that they would need to seek pre-authorization for services.  Plaintiffs' First Opposition at 34-35.  In support, Plaintiffs draw heavily upon the New York Court of Appeals' recent decision in *Plavin v. Group Health Inc.*, 35 N.Y.3d 1, 5, *reargument denied*, 35 N.Y.3d 1007 (2020), where the court considered questions certified by the Third Circuit.  The New York Court of Appeals in *Plavin* examined claims under sections 349 and 350 of New York's General Business Law.  "[T]o state a claim under sections 349 or 350, a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice."  *Id.* at 10 (internal quotation marks omitted).  The plaintiffs in *Plavin* argued that "GHI made misleading statements and omissions in its summary materials regarding the Plan's out-of-network reimbursement rates, how often the reimbursement rate schedule was updated, the catastrophic coverage reimbursement rate, and the breadth of coverage of the optional rider."  *Id.* at 6-7.  The New York Court of Appeals held that the plaintiffs had sufficiently alleged consumer-oriented conduct to state a claim under the General Business Law.  *Id.* at 12-13.  Plaintiffs here argue that, based on the holding in *Plavin*, Defendants committed fraud by omitting any reference to pre-authorization review in their marketing materials.  Plaintiffs' First Opposition at 32.

As discussed above, the Court cannot consider these new materials and new theories raised for the first time in opposition to the motions to dismiss.  Plaintiffs, however, "recognize that certain details included in [their] brief are not fully fleshed out in the Complaint," and have requested leave to amend the Complaint to add "additional details concerning Defendants' fraudulent scheme."  *Id.* at 34 n.11.

Under Rule 15(a) of the Federal Rules of Civil Procedure, a court "should freely give leave

when justice so requires." Fed. R. Civ. P. 15(a). However, leave to amend should generally be denied "in instances of futility, undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, or undue prejudice to the non-moving party." *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 126 (2d Cir. 2008). This standard is "permissive," and reflects a "strong preference for resolving disputes on the merits." *Loreley Fin. (Jersey) No. 3 Ltd.*, 797 F.3d at 190 (quoting *Williams v. Citigroup Inc.*, 659 F.3d 208, 212-13 (2d Cir. 2011) (per curiam)). "Complaints dismissed under Rule 9(b) are almost always dismissed with leave to amend." *Luce v. Edelstein*, 802 F.2d 49, 56 (2d Cir. 1986) (internal quotation marks omitted); *accord Pasternack v. Shrader*, 863 F.3d 162, 175 (2d Cir. 2017); *see also ATSI, Commc'ns., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007) ("District courts typically grant plaintiffs at least one opportunity to plead fraud with greater specificity when they dismiss under Rule 9(b).").

This is Plaintiffs' first request to amend their Complaint, and there is no indication that they have caused any undue delay, engaged in any bad faith, or have any dilatory motives. Nor have Defendants demonstrated any prejudice that would result from allowing amendment at this early stage of the case. The Court does recognize that Plaintiffs face an uphill battle in amending their Complaint: Their fraud claim is subject to Rule 9(b), quite unlike the General Business Law claims at issue in *Plavin*, which were subject to a lower pleading standard. Moreover, under New York law, "an *omission* does not constitute fraud unless there is a fiduciary relationship between the parties," *Abu Dhabi Commer. Bank v. Morgan Stanley & Co.*, 888 F. Supp. 2d 431, 451 n.96 (S.D.N.Y. 2012) (emphasis added) (internal quotation marks omitted), and Plaintiffs have not alleged any facts suggesting that Defendants had a fiduciary duty to Kathleen, *see Batas*, 724 N.Y.S.2d at 7 (declining to find that an insurance company could be liable for a breach of fiduciary

duty because there was "no showing that [the insured's] relationship with defendants is unique or differs from that of a reasonable consumer and offer no reason to depart from the general rule that the relationship between the parties to a contract of insurance is strictly contractual in nature"). However, given the liberal standard on a motion to amend, the Court will dismiss Plaintiffs' fraud claim without prejudice and will permit Plaintiffs leave to amend their allegations as to fraud.

With respect to the conspiracy claim, it is well-settled that "New York does not recognize civil conspiracy to commit a tort as an independent cause of action." *McSpedon v. Levi*ne, 72 N.Y.S.3d 97, 101 (App. Div. 2018). But a plaintiff may, of course, "plead the existence of a conspiracy in order to connect the actions of the individual defendants with an actionable, underlying tort, and establish that those actions were part of a common scheme." *Id.* Because the Complaint fails to state a claim for fraud, the conspiracy count must be dismissed. But because the Court will allow Plaintiffs to amend their fraud claim, it dismisses the conspiracy claim without prejudice and will permit Plaintiffs to add additional allegations regarding their conspiracy claim in accordance with the above.

### 6. Derivative Claims

Plaintiffs bring several additional claims: "bad faith/punitive damages," loss of services, and loss of guidance to a minor child. Each of these claims is derivative, and cannot survive absent a substantive cause of action. *See N.Y. Univ.*, 87 N.Y.2d at 316 (holding that to state a claim for punitive damages from a breach of contract, "the threshold task for a court considering defendant's motion to dismiss a cause of action for punitive damages is to identify a tort independent of the contract"); *Dunham v. Vodidien, LP*, 498 F. Supp. 3d 549, 566 (S.D.N.Y. 2020) (explaining that a "punitive damages claim is derivative," with "no viability absent its attachment to a substantive cause of action"); *Nealy v. U.S. Surgical Corp.*, 587 F. Supp. 2d 579, 585 (S.D.N.Y. 2008) ("Under

New York law, a claim for loss of companionship, society, services, or support is derivative of the related primary causes of action; dismissal of the primary claims requires the Court to dismiss any dependent derivative claims."); *Zawahir v. Berkshire Life Ins. Co.*, 804 N.Y.S.2d 405, 406 (App. Div. 2005) ("'[T]here is no separate cause of action in tort for an insurer's bad faith failure to perform its obligations' under an insurance contract." (quoting *Cont'l Cas. Co. v. Nationwide Indem. Co.*, 792 N.Y.S.2d 434, 435 (App. Div. 2005)).   However, because the Court grants Plaintiffs leave to amend their fraud and conspiracy claims, it dismisses the derivative claims without prejudice.

### III. Conclusion

In light of the foregoing, eviCore's, GHI's, and Emblem's motions to dismiss are granted. Plaintiffs' negligence, medical malpractice, prima facie tort, breach of contract, and breach of the implied covenant of good faith and fair dealing claims are dismissed with prejudice.   Plaintiffs' fraud, conspiracy, punitive damages, loss of services, and loss of guidance claims are dismissed without prejudice.   Plaintiffs may file an Amended Complaint within two weeks of the date of this Opinion and Order.   If Plaintiffs fail to abide by the two-week deadline and do not seek an extension from the Court, their remaining claims may be dismissed with prejudice without further notice.

The Clerk of the Court is respectfully directed to terminate the motions pending at Docket Numbers 23, 24, and 60.

SO ORDERED.

Dated: June 15, 2021
      New York, New York
                                      JOHN P. CRONAN
                           United States District Judge