UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KATHLEEN VALENTINI, VALERIO
VALENTINI, and VALERIO VALENTINI on
behalf of his minor son M. V.,

                                    Plaintiffs,

            - against -

GROUP HEALTH INCORPORATED, EMBLEM
HEALTH, INC., CARECORE NATIONAL LLC
d/b/a EVICORE, and JOHN DOES 1 AND 2,

                                    Defendants.

No. 20 Civ. 9526 (JPC)

## **Plaintiffs' Memorandum of Law in Opposition to Defendants' Motions to Dismiss**

**POLLOCK COHEN LLP**
60 Broad St., 24th Floor
New York, NY 10004
*Co-counsel for Plaintiffs*

**MERSON LAW PLLC**
150 East 58th St.
New York, NY 10155
*Co-counsel for Plaintiffs*

# **Table of Contents**

Preliminary Statement ........................................................................................................ 1

Factual Background ........................................................................................................... 2

Argument ........................................................................................................................... 7

    I.   Standard of Review........................................................................................... 7

        A.  Fed. R. Civ. P. 12(b)(6)........................................................................ 7

        B.  Fed. R. Civ. P. 9(b).............................................................................. 8

    II.  Plaintiffs' fraud claim is not duplicative of any contract claim. ......................... 8

    III. The Amended Complaint satisfies Fed. R. Civ. P. 9(b). .................................. 11

        A.  The Court of Appeals ruling in Plavin is relevant in several respects......................... 12

        B.  Plaintiffs' complaint identifies specific false statements in specific documents prepared by Defendants, and adequately alleges all other elements of fraud. ........................... 13

        C.  The amended complaint contains sufficient detail concerning each Defendant's misconduct. ....................................................................... 23

        D.  The Complaint adequately alleges a conspiracy to commit fraud............................ 24

    IV. Plaintiffs derivative and punitive damages claims are viable. ........................... 25

Conclusion ....................................................................................................................... 25

# Table of Authorities

## Cases

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*
  888 F. Supp. 2d 431 (S.D.N.Y. 2012) ..................................................................... 19

*AFP Mfg. Corp. v. AFP Imaging Corp.*
  No. 17 Civ. 03292 (NSR), 2018 WL 3329859 (S.D.N.Y. July 6, 2018) ................... 19

*Ashcroft v. Iqbal*
  556 U.S. 662 (2009) ............................................................................................... 8

*Cohen Bros. Realty Corp. v. Mapes*
  181 A.D.3d 401 (1st Dep't 2020) .......................................................................... 24

*Fernandez-Rodriguez v. Licon-Vitale*
  470 F. Supp. 3d 323 (S.D.N.Y. 2020) ...................................................................... 7

*Grappo v. Alitalia Linee Aeree Italiane, S.p.A.*
  56 F.3d 427 (2d Cir. 1995) ...................................................................................... 9

*Halebian v. Berv*
  644 F.3d 122 (2d Cir. 2011) ..................................................................................... 7

*In re DDAVP Direct Purchaser Antitrust Litig.*
  585 F.3d 677 (2d Cir. 2009) ................................................................................... 19

*In re Merrill Lynch & Co. Rsch. Reps. Sec. Litig.*
  568 F. Supp. 2d 349 (S.D.N.Y. 2008) .................................................................... 23

*Inn Chu Trading Co. v. Sara Lee Corp.*
  810 F. Supp. 501 (S.D.N.Y. 1992) .......................................................................... 20

*King Cty., Wash. v. IKB Deutsche Industriebank AG*
  708 F. Supp. 2d 334 (S.D.N.Y. 2010) .................................................................... 23

*LBBW Luxemburg S.A. v. Wells Fargo Sec. LLC*
  10 F. Supp. 3d 504 (S.D.N.Y. 2014) .................................................................. 18, 19

*Liberty Mut. Ins. Co. v. Harvey Gerstman Assocs., Inc.*
  No. 11 Civ. 4825 (SJF) (ETB), 2012 WL 5289606 (E.D.N.Y. Sept. 13, 2012) .......... 9

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*
  797 F.3d 160 (2d Cir. 2015) ................................................................................... 24

*Minnie Rose LLC v. Yu*
  169 F. Supp. 3d 504 (S.D.N.Y. 2016) .................................................................... 16

*Moon Joo Yu v. Premiere Power LLC*
  2015 WL 4629495 (S.D.N.Y. Aug. 4, 2015) ........................................................... 24

*Musalli Factory For Gold & Jewellry v. JPMorgan Chase Bank, N.A.*
  261 F.R.D. 13 (S.D.N.Y. 2009) ............................................................................... 21

*New Hope Family Servs., Inc. v. Poole*
966 F.3d 145 (2d Cir. 2020)..............................................................................2, 7

*Paraco Gas Corp. v. Travelers Cas. & Sur. Co. of Am.*
51 F. Supp. 3d 379 (S.D.N.Y. 2014) ..................................................................22

*Plavin v. Grp. Health Inc.*
35 N.Y.3d 1 (2020).......................................................................................passim

*Richbell Info. Servs. v Jupiter Partners*
309 A.D.2d 288 (1st Dept 2003) ........................................................................11

*Stagl v. Delta Airlines*
52 F.3d 463 (2d Cir. 1995).................................................................................. 8

*State Farm Mut. Auto. Ins. Co. v. James M. Liguori, M.D., P.C.*
589 F. Supp. 2d 221(E.D.N.Y. 2008)..................................................................23

*STMicroelectronics, N.V. v. Credit Suisse Securities (USA) LLC*
648 F.3d 68 (2d Cir. 2011)..................................................................................21

*Sun Prods. Corp. v. Bruch*
507 F. App'x 46 (2d Cir. 2013) ...........................................................................11

*Valentini v. Grp. Health Inc.*
No. 20 Civ. 9526 (JPC), 2021 WL 2444649 (S.D.N.Y. June 15, 2021)................. 8

*Wall v. CSX Transp., Inc.*
471 F.3d 410 (2d Cir. 2006).............................................................................9, 11

*Wiener v. Fireman's Fund Ins. Co.*
No. 14 Civ. 3699 (CBA) (JO), 2015 WL 13742025 (E.D.N.Y. June 15, 2015) ..........9, 10

*WIT Holding Corp. v. Klein*
282 A.D.2d 527 (2d Dep't 2001)......................................................................... 9

*Woodhams v. Allstate Fire & Cas. Co.*
748 F. Supp. 2d 211 (S.D.N.Y. 2010) ................................................................18

*Woori Bank v. RBS Sec., Inc.*
910 F. Supp. 2d 697 (S.D.N.Y. 2012) ................................................................21

**Rules**

Fed. R. Civ. P. 9.................................................................................................. 8

Fed. R. Civ. P. 12................................................................................................ 7

**Treatises**

10B Wright & Miller, Federal Practice and Procedure § 2730 (4th ed. 1998)............19

Plaintiff Val Valentini, on behalf of himself, his son, and the estate of his deceased wife Kathleen Valentini, respectfully submits this memorandum of law in opposition to Defendants' motions to dismiss.

## PRELIMINARY STATEMENT

This is a case about horrific negligence and medical malpractice, but it is also a case about fraud. Kathleen Valentini, a 46 year-old mother and wife, chose a health care plan based on marketing materials drafted by Defendants. These materials promised Kathleen that unlike other plans being offered, with this plan she would have the "freedom to choose any provider" and "select the specialist and make the appointment." AC ¶ 145. "Pre-certification" applied only to "home health care services" and "prior authorization" applied only to "brand name medications."

But when Kathleen's doctor ordered an MRI to diagnose ongoing hip pain that had not improved with physical therapy and Aleve, Defendants suddenly disclosed that Kathleen did not get to "select the specialist and make the appointment." Instead, Defendants would insert themselves into the process and act as gatekeepers to her medical care. They over-ruled her doctors' recommendation, saying the MRI was not "medically necessary." Kathleen was unable to select the specialist or make the appointment. Instead, Defendants gave obviously wrong medical advice -- directing her to first try physical therapy and Aleve before they would allow an MRI – which Kathleen had already completed and Defendants had paid for.

Defendants variously term their interference pre-certification, prior authorization, preauthorization, and utilization review – with the purpose and effect of misleading members. What is clear is that Defendants engaged in a classic bait-and-switch form of fraud – promising one thing in the marketing materials; then luring in consumers and delivering something very different. Kathleen relied on Defendants' false promises with tragic consequences.

After 38 days of bureaucratic delays, Defendants reversed themselves. Kathleen got the MRI and it showed a sarcoma. She went to Memorial Sloan Hospital where her treating doctors told her: had you come a month sooner, we would have treated you just with chemotherapy. Now we have to amputate your leg, hip, and pelvis. She died two years later.

## **FACTUAL BACKGROUND**[1]

Plaintiff Kathleen Valentini was, at all relevant times, covered under the Defendants' health insurance policy known as the GHI-CPB or Comprehensive Benefits Plan (the "Plan", attached to Plaintiffs' first Amended Complaint "AC" as Ex. A).[2] Plaintiffs, however, were never provided a copy of the Plan when making a decision about their health insurance. *Id*. ¶ 136. Instead, Defendants presented Plaintiffs with false and misleading summary materials that were designed to induce them to choose Defendants' Plan over other available options. *Id*. ¶ 137.

The Plan is one of approximately 11 health insurance plans available to New York City employees and retirees. AC ¶ 138. As the New York Court of Appeals explained in *Plavin v. Grp. Health Inc.*, 35 N.Y.3d 1 (2020), City employees and retirees like the Valentinis are provided with health insurance as part of their employment/retirement package, and have the option to choose from among eleven health insurance plans. Employees and retirees make the choice of which plan to use based on the representations made by each of the insurance companies – including EmblemHealth/GHI – in materials prepared solely by the insurance companies and sent to the City employees/retires:

---

[1] These facts are drawn from Plaintiffs' complaint and accepted as true for purposes of this motion. *New Hope Family Servs., Inc. v. Poole*, 966 F.3d 145, 160 (2d Cir. 2020). As noted at AC footnote 12, Plaintiffs reserve their objections to the Court's consideration of certain materials in ruling on the Defendants' motion to dismiss the original Complaint. However, in light of the Court's prior ruling that it would rely on them in ruling on the sufficiency of Plaintiffs' claims, Plaintiffs address these documents here.

[2] Plaintiffs are not parties to the Plan, which is a contract between Defendant EmblemHealth/GHI and the City of New York. Dk. No. 68. AC ¶ 134. Plaintiffs are the third-party beneficiaries of that contract, and the benefits afforded to the Plaintiffs are described in the Plan. Id. ¶¶ 134–135.

> GHI's summary materials, prepared and edited solely by GHI, contained the
> only information provided to City employees and retirees when determining
> whether to select GHI's Plan.

AC ¶ 138 (citing *Plavin*, 35 N.Y.3d at 6).

These materials are known as the Summary Program Description ("SPD") and contains material misrepresentations that were extraneous to the Plan. Further, as the Court of Appeals noted, "In addition, GHI created its own online summary of benefits and coverage, which was available on its website." *Id*. This "Summary of Benefits and Coverage" ("SBC") is attached to Plaintiffs' amended complaint as Exhibit C. *Id*. ¶ 140; ECF No. 68. There are material differences between the SPD, the SBC, and Plan that are part of a larger "bait and switch" scheme to deceive prospective members into choosing their Plan under false pretenses. *Id*. ¶ 141.

The SPD – the only Plan description sent to all prospective members – makes two clear promises to induce City employees and retirees to choose the GHI-CBP option: "With GHI-CBP, you have the freedom to choose any provider worldwide," and: "GHI's provider network includes all medical specialties. When you need specialty care, you select the specialist and make the appointment. Payment for services will be made directly to the provider - you will not have to file a claim form when you use a GHI participating provider." AC ¶ 145.

These statements were false when made and Defendants knew it. Defendants argue that "[w]hen read in context" the Summary Program Description "is a 54-page booklet," which "focuses on describing the differences in benefits between the different type of health plans." Defs. MTD at 8. This "context" confirms that Defendants knew that prospective members, including Mrs. Valentini, were going to rely on these materials and make their decision about which insurance policy to choose – based on the Defendants' representations in the documents. And Defendants knew that the documents contained statements were materially false.

The Defendants' (false) descriptions of the Plan's benefits in the SPD underscores how deliberately misleading those statements are. (Ex. 73-1) On page 21 of the SPD the Defendants describe another of the 11 health plans City employees can choose from: the GHI DC-37 Med-Team plan. The Defendants' description of the GHI-DCE-37 Med Team plan says:

> **Precertification**: Non-emergency hospital admissions, diagnostic X-rays and certain other medical services require precertification. Failure to comply with precertification requirements may result in a reduction of benefits. Ex. 73-1 (Summary Program Description) at 21.

Here, Defendants make clear that under the GHI DC-37 Med-Team plan, "precertification" for certain procedures was a key part of the plan: it is in bold and deserves its own paragraph. But on *the very next page* – where Defendants describe the GHI-CBP plan – Defendants falsely stated that she would have "the freedom to choose any provider worldwide," and: "When you need specialty care, you select the specialist and make the appointment. Payment for services will be made directly to the provider - you will not have to file a claim form when you use a GHI participating provider." AC ¶ 145 (quoting Summary of Benefits at 22).

The sharp contrast of plan descriptions on two successive pages is telling. The GHI DC-37 Med-Team plan makes clear that pre-certification is required. In the GHI-CBP description however, "precertification" never appears in the context of x-rays or any other medical procedure. It is mentioned only as a requirement for "Home Care Services." AC ¶ 149. (Similarly, Defendants mention "prior authorization" only in the context of "brand name prescription drugs," falsely implying that it is limited to that context.)

Defendants knew that pre-certification of x-rays and other medical services was an important consideration for people deciding which health insurance plan to choose, as evidenced by their highlighting of this information in the GHI DC-37 Med-Team plan description. Yet Defendants falsely describe the GHI-CBP Plan as allowing Kathleen to "choose any provider"

and "select the specialist and make the appointment." AC ¶ 145 (quoting SPD at 22). The SPD's reference to pre-certification being limited to Home Care Services is false and intentionally misleading. For Defendants obviously demanded pre-certification for Kathleen's MRI.

Kathleen Valentini relied upon the SPD in choosing the GHI-CBP plan. AC ¶ 145. She relied on its promise that "GHI's provider network includes all medical specialties;" that she could "select the specialist and make the appointment;" that she "would not have to file a claim form;" – all of which were intended to and did represent to Kathleen that she would receive basic diagnostic tests prescribed by her doctor without Defendants imposing additional roadblocks never mentioned in the SPD.

That misrepresentation and resulting choice of the GHI-CBP plan would have tragic consequences for the Valentini family. On November 11, 2018, Kathleen visited her primary care physician because of pain in her right hip. He prescribed and Kathleen completed physical therapy, but continued to experience pain in her right hip and radiating down her right leg. *Id.* ¶ 27. Concerned about her condition, Dr. Bauer referred her to an orthopedic specialist, Dr. Barry Oliver. *Id.* ¶¶ 28–29. Kathleen saw Dr. Oliver on February 4, 2020. Following that examination, Dr. Oliver ordered an MRI. *Id.* ¶¶ 30-31.

As described above, Defendants had falsely represented that Kathleen would "have the freedom to choose any provider worldwide," and that: "GHI's provider network includes all medical specialties. When you need specialty care, you select the specialist and make the appointment. Payment for services will be made directly to the provider." AC ¶ 145. Nonetheless, Dr. Oliver – Kathleen's orthopedist who prescribed an MRI for Kathleen's leg and hip pain – was apparently familiar with the ways in which Defendants' business practices deviated from their representations. Even though none of the consumer-facing materials provided to Plaintiffs by GHI state that pre-authorization is required for an MRI, Dr. Oliver

immediately sought pre-authorization from GHI. *Id.* ¶ 31. eviCore claims to have received the request for pre-authorization on February 11, and asked Dr. Oliver for more information, which he faxed to them on February 13. *See* Defendant eviCore's Memorandum of Law (ECF No. 29, "eviCore Mem."), at 3. In a letter dated February 16, 2020 that contained the logos of both Defendants, they informed Kathleen and Dr. Oliver that, based on eviCore's review of clinical and medical information, Defendants had concluded that the MRI for Kathleen was not medically necessary, and were therefore denying the request for pre-authorization. AC ¶ 34.

The letter also advised on the circumstances in which an MRI would have been deemed medically necessary and approved, in light of Kathleen's symptoms. *Id.* ¶ 35. Specifically, Defendants wrote that an MRI was not medically necessary, in their view, because Kathleen had not yet demonstrated a failure to improve following a 6-week trial of treatment, which might include rest, drugs for pain, or a workout program (*i.e.*, physical therapy). *Id.* ¶ 35.

eviCore's approach was in line with its website, which emphasizes – contrary to its self-serving assertions in this litigation – that eviCore is in the business of dictating medical care is appropriate and "ensuring" that the patient follows eviCore's recommendation. The website includes numerous statements concerning eviCore's alleged commitment to "mak[ing] sure the patient gets the right procedure," including:

a. that EviCore "want[s] to share [] info with the patient … so they can make an informed choice…. Based on evidence-based medicine. … **not just what they are told to do [by their treating physician], they have been advised and counseled and guided [by eviCore] to make an appropriate choice**."

b. that EviCore delivers "improved patient outcomes by **ensuring health plan members receive the appropriate test or treatment necessary for their individual case presentation** or condition. … eviCore's approach is not to deny care that is needed **but rather to redirect providers and patients to more appropriate testing and treatment options**.

AC ¶¶ 53–54 (all emphasis added).

In short, contrary to the marketing materials' representations that Kathleen could choose the provider and specialists to provide her medical care – eviCore specifically told Kathleen what she had to do medically, "advising and counseling" her on the "appropriate test or treatment" for her condition and "redirecting" her to alternate treatment options. *Id.* ¶¶ 35, 53–54. Unfortunately, eviCore's redirection was misguided and its proposed treatment options were obviously inappropriate based on Kathleen's medical record, which eviCore should have reviewed, but did not. *Id.* ¶¶ 35–36.

Dr. Oliver appealed, and Defendants reversed themselves on March 7. AC ¶ 8. Kathleen got her MRI shortly afterwards on March 14, more than 40 days after Dr. Oliver requested pre-authorization. The MRI revealed a sarcoma in her hip. *Id.* ¶ 9. When Kathleen presented to doctors at Memorial Sloan Kettering in April, her treating physicians told Kathleen and Val: had you come here a month sooner, we could have treated this with chemotherapy. But because of the delay, we have to amputate your leg, hip, and pelvis. *Id.* ¶¶ 10–12.

## ARGUMENT

### I. Standard of Review

#### A. Fed. R. Civ. P. 12(b)(6).

"The purpose of Federal Rule of Civil Procedure 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits or weighing the evidence that might be offered to support it." *Fernandez-Rodriguez v. Licon-Vitale*, 470 F. Supp. 3d 323, 355–56 (S.D.N.Y. 2020) (quoting *Halebian v. Berv* 644 F.3d 122, 130 (2d Cir. 2011)) (alterations omitted).

Thus, in considering Defendants' 12(b)(6) motion, the Court must "accept all factual allegations in the complaint as true, and draw all reasonable inferences in the plaintiff's favor." *New Hope Family Servs., Inc. v. Poole*, 966 F.3d 145, 160 (2d Cir. 2020) (citations and alterations

omitted). It then determines whether the allegations, accepted as true, "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quotations omitted).

### B. Fed. R. Civ. P. 9(b)

This Court described the fraud pleading standards in its ruling on defendants' last motion to dismiss: "Rule 9(b) requires that 'a party must state with particularity the circumstances constituting fraud or mistake,' although '[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally.' …. In other words, Rule 9(b) requires pleading the circumstances of the fraud and the defendant's mental state." *Valentini v. Grp. Health Inc.*, No. 20 Civ. 9526 (JPC), 2021 WL 2444649, at *6 (S.D.N.Y. June 15, 2021) (citation omitted).

"As to the circumstances, the complaint must (1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent. In terms of a defendant's mental state, the complaint must allege facts 'that give rise to a strong inference of fraudulent intent. Courts view the alleged facts in their totality, not in isolation." *Id.* (citations and internal quotations omitted).

## II. Plaintiffs' fraud claim is not duplicative of any contract claim.

Defendants first argue that Plaintiffs' fraud claims should be dismissed because they "duplicate their breach of contract claims." Defs. MTD at 16. This line of authority does not bar Plaintiffs' claims because (1) the misrepresentations were collateral to the Plan; (2) Plaintiffs are not parties to the Plan – a contract between Defendants and the City of New York; and (3) the Court dismissed Plaintiffs' contractual claims, and so there are no contractual causes of action that the fraud claims could duplicate.[3]

---

[3] Plaintiffs maintain that the Court erred in dismissing these and other claims, but do not ask the Court to reconsider its decision here.

First, New York law specifically recognizes that fraud claims are not duplicative when the misrepresentation is collateral to the contract it induced. *Wall v. CSX Transp., Inc.*, 471 F.3d 410, 416 (2d Cir. 2006) (quoting *WIT Holding Corp. v. Klein*, 282 A.D.2d 527, 528 (2d Dep't 2001) ("[A] misrepresentation of material fact, which is collateral to the contract and serves as an inducement for the contract, is sufficient to sustain a cause of action alleging fraud."). Here, the complaint alleges that Defendants made several knowing misrepresentations in their marketing materials, and that those misrepresentations induced Plaintiffs to choose Defendants' health care plan over other available options. AC ¶¶ 134-152.

These misrepresentations are contained in documents other than the Plan, and are collateral to it. As such, they are not barred by any doctrine concerning duplicative claims. See, e.g., *Liberty Mut. Ins. Co. v. Harvey Gerstman Assocs., Inc.*, No. 11 Civ. 4825 (SJF) (ETB), 2012 WL 5289606, at *10 (E.D.N.Y. Sept. 13, 2012), report and recommendation adopted, No. CV-11-4825 SJF ETB, 2012 WL 5289587 (E.D.N.Y. Oct. 24, 2012) ("In light of the Gerstman Affiliates' representation that the alleged misrepresentation made by Liberty regarding the classification of the project leaders induced them to select a workers' compensation insurance policy with Liberty rather than with one of Liberty's competitors, the fraudulent inducement claim is not duplicative of the breach of contract claim.").[4]

Defendants' reliance on *Wiener v. Fireman's Fund Ins. Co.*, No. 14 Civ. 3699 (CBA) (JO), 2015 WL 13742025, at *6 (E.D.N.Y. June 15, 2015) (cited in Defs. MTD at 15 as "instructive") is misplaced. Plaintiffs' complaint in *Weiner* was that their basement had been damaged by sewage,

---

[4] *See also Grappo v. Alitalia Linee Aeree Italiane, S.p.A.*, 56 F.3d 427, 434 (2d Cir. 1995) ("A cause of action for fraud does not generally lie where the plaintiff alleges only that the defendant entered into a contract with no intention of performing…. A fraud action is permitted, however, where the plaintiff alleges that the defendant engaged in other fraudulent conduct besides entering the contract with no intention to perform.") (citations and internal quotations omitted)

and the insurance company, in order to deny coverage, falsely claimed the damage was caused by something else. *Id.* at *6 ("Plaintiffs nowhere contend FFIC denies that their policy covers sewer-water damage. Instead, they allege FFIC declined to pay their claim because it found floodwater, not sewage, damaged plaintiffs' basement.") As the Court explained: the plaintiffs "claim[ed] they were induced to pay for a more expensive policy based on [the defendant]'s representations that the policy covered damage caused by sewage." *Id.* at *6. "This allegation fail[ed to advance plaintiffs fraud-based claims, however, because those representations are not alleged to be false." *Id.* at *6 (quotation and alteration omitted).

Here, by contrast, the complaint alleges that defendants made numerous false statements concerning the scope and details of their policy in the marketing materials provided to Plaintiffs. The issue is not simply that Defendants offered obviously false rationales for blocking Kathleen's access to the MRI her doctor ordered (although they did that too); it is that they falsely promised Kathleen that such roadblocks did not exist under the Plan, but then imposed them anyway. Defendants' "'non-performance'" of the Policy itself," Defs. MTD at 17, is an entirely separate matter. Thus, the misrepresentations alleged are collateral to the contract and the fraud claims are not duplicative of any contractual claims. Notably, Defendants' own papers concede: "Plaintiff's fraud theory is based upon Ms. Valentini's decision as to which plan to choose. *At this point she was underlined even in contractual privity, let alone a fiduciary relationship*." Defs. MTD at 19 (emphasis added). Defendants' misrepresentations in the SPD were extraneous to the Plan, and Defendants' argument that the fraud claims can be dismissed as duplicative of contractual claims is wrong.[5]

---

[5] The *Weiner* Court also held that the plaintiffs did not "plead facts comparing FFIC to its competitors. That undercut[] any fraudulent inducement claim on the theory that FFIC falsely held itself out to be 'faster, more reliable, more accurate and more dependable' than other insurers." *Id.* at *6. This holding has nothing to do with Plaintiffs' claims, which clearly demonstrate the falsity of Defendants' statements as discussed below.

and the insurance company, in order to deny coverage, falsely claimed the damage was caused by something else. *Id.* at *6 ("Plaintiffs nowhere contend FFIC denies that their policy covers sewer-water damage. Instead, they allege FFIC declined to pay their claim because it found floodwater, not sewage, damaged plaintiffs' basement.") As the Court explained: the plaintiffs "claim[ed] they were induced to pay for a more expensive policy based on [the defendant]'s representations that the policy covered damage caused by sewage." *Id.* at *6. "This allegation fail[ed to advance plaintiffs fraud-based claims, however, because those representations are not alleged to be false." *Id.* at *6 (quotation and alteration omitted).

Here, by contrast, the complaint alleges that defendants made numerous false statements concerning the scope and details of their policy in the marketing materials provided to Plaintiffs. The issue is not simply that Defendants offered obviously false rationales for blocking Kathleen's access to the MRI her doctor ordered (although they did that too); it is that they falsely promised Kathleen that such roadblocks did not exist under the Plan, but then imposed them anyway. Defendants' "'non-performance'" of the Policy itself," Defs. MTD at 17, is an entirely separate matter. Thus, the misrepresentations alleged are collateral to the contract and the fraud claims are not duplicative of any contractual claims. Notably, Defendants' own papers concede: "Plaintiff's fraud theory is based upon Ms. Valentini's decision as to which plan to choose. *At this point she was underlined even in contractual privity, let alone a fiduciary relationship*." Defs. MTD at 19 (emphasis added). Defendants' misrepresentations in the SPD were extraneous to the Plan, and Defendants' argument that the fraud claims can be dismissed as duplicative of contractual claims is wrong.[5]

---

[5] The *Weiner* Court also held that the plaintiffs did not "plead facts comparing FFIC to its competitors. That undercut[] any fraudulent inducement claim on the theory that FFIC falsely held itself out to be 'faster, more reliable, more accurate and more dependable' than other insurers." *Id.* at *6. This holding has nothing to do with Plaintiffs' claims, which clearly demonstrate the falsity of Defendants' statements as discussed below.

In addition, this doctrine is inapplicable here because there is no contract between Plaintiffs and Defendants. Plaintiffs are third-party beneficiaries of an agreement between Defendant and the City of New York. Defendants cite no cases applying this doctrine in the context of contractual claims by third-party beneficiaries.

Finally, the Court has already ruled that Plaintiffs have not adequately alleged any breach of contract by Defendants; accordingly the fraud claims cannot be duplicative of any such claims. "[A] fraud claim may be dismissed as duplicative only as against a defendant against whom the related contract claim is viable." *Richbell Info. Servs. v Jupiter Partners*, 309 A.D.2d 288, 305 (1st Dept 2003); *see also Sun Prods. Corp. v. Bruch*, 507 F. App'x 46, 48 (2d Cir. 2013) ("[A] fraud claim may be dismissed as duplicative only as against a defendant against whom the related contract claim is viable.") (emphasis and citation omitted).

## III.     The Amended Complaint satisfies Fed. R. Civ. P. 9(b).

Th elements of fraud under New York law are: "(1) the defendant made a material false representation; (2) the defendant intended to defraud the plaintiff thereby; (3) the plaintiff reasonably relied upon the representation; and (4) the plaintiff suffered damage as a result of such reliance." *Wall*, 471 F.3d at 410. Plaintiffs adequately plead each of these elements.

Plaintiffs have fully satisfied Rule 9(b) by identifying the specific false statements made by defendants, attaching to the complaint the marketing materials in which those false statements are found, and explaining in great detail why the statements are fraudulent. The amended complaint also adequately pleads scienter and reliance, both of which are fact-intensive inquiries that are rarely appropriate for decision on a motion to dismiss. Rule 9(b) does not require Plaintiffs to know or plead every detail of Defendants' fraudulent scheme at this stage.

## A.     The Court of Appeals ruling in Plavin is relevant in several respects.

The fraud perpetrated by the GHI Defendants begins with the marketing materials the insurer prepared, which were sent to prospective customers, including Plaintiffs, in order to get them to designate the GHI-Plan as their health insurance provider. AC ¶¶ 131–133. Although Defendants take great pain to note the fact that the Plan spells out the utilization review process, they fail to note that the complaint alleges that the policy was never sent to members. Nor was the policy even available to prospective members when the Valentinis were considering which plan to purchase, as reflected in the Plavin litigation. *Plavin v. Grp. Health Inc.*, 2019 WL 1965741, at *2 (3d Cir. Apr. 4, 2019). The only information provided to the Valentinis – and the 600,000 other New York City employees and retirees eligible for the Plan – was the SPD's single sheet description, written by EmblemHealth and distributed by the NYC Office of Labor Relations. *Id.*

This description of the Plan contains absolutely no reference to any pre-authorization that might be required prior to an MRI – or any other diagnostic test or medical procedure – prescribed by a doctor.[6] (The word "precertified" appears in the SPD, but it refers only to home care services.) Importantly, it was the SPD that constituted the marketing materials that Defendants used to attract potential members to designate the Plan as the health plan of choice. As the New York Court of Appeals pointed out in *Plavin*:

> Significantly, it is the allegedly misleading summary materials that are the subject of plaintiff's case—not the contract between the City and GHI, which purportedly was never provided to City employees and retirees. Plaintiff alleged that GHI created misleading benefit and coverage summaries, which it published on its website and caused to be distributed by the City to all similarly situated employees and retirees, and that this marketing was critical to GHI's effort to induce City employees and retirees to select its Plan.

*Plavin v. Group Health Incorporated,* 35 NY3d 1, 11 (2010)

---

[6] The current version of the SPD (Ex. I) has the same material omissions.

The misleading nature of Defendants' inducements to attract members is not merely alleged here and in the *Plavin* case. As the Court of Appeals noted:

> Prior to plaintiff's commencement of this action, the New York State Attorney General conducted an investigation, and concluded that GHI's representations in connection with its summary materials—substantially similar as those at issue here—repeatedly violated General Business Law §§ 349 and 350. The Attorney General reasoned that GHI's representations were harmful because City "employees and retirees cannot make well-informed decisions in selecting the appropriate health plan, if they are not afforded adequate information regarding the substantial out-of-pocket costs they may incur if they receive services from out-of-network providers." As a result, in 2014, GHI entered into an Assurance of Discontinuance, wherein GHI did not admit guilt, but agreed to several remedial measures, including modification of all of its "consumer-facing materials" to "ensure that NYC employees and retirees are presented with clear information."

*Plavin v. Grp. Health Inc.*, 35 N.Y.3d 1, fn. 2 (2020).

In sum, the rulings in the *Plavin* case provide substantial support for Plaintiffs' fraud claims. Among other things, they reject Defendants' theory that the marketing materials could not contain misleading statements if those misstatements were corrected in the Plan itself. The contradictory statements provide evidence of Defendants' fraudulent intent, and showcase the manner in which Plaintiffs and others relied on Defendants' misstatements. Moreover, as detailed below, the Plan itself is often materially contradictory to the marketing materials.

**B.    Plaintiffs' complaint identifies specific false statements in specific documents prepared by Defendants, and adequately alleges all other elements of fraud.**

As detailed in Plaintiffs' Amended Complaint, Defendants' fraudulent statements began with their misleading promises made in the SPD to induce Plaintiffs to choose their Plan, in precisely the same manner detailed by the Court of Appeals in *Plavin*.[7] The fraudulent nature of

---

[7] As the Court of Appeals noted, "it was, therefore, in GHI's financial interest for individual City employees and retirees to choose its Plan over the other available options. Simply put, plaintiff alleged that GHI was incentivized by the competition created during the open enrollment period to leverage its information advantage in order to gain the business of the employees and retirees over other insurers .…" *Plavin v. Grp. Health Inc.*, 35 N.Y.3d 1, 12 (2020).

Defendants' promises – that specialist care was available just by making the appointment with no need for pre-authorization – was dramatically revealed when eviCore wrote to Kathleen overruling Dr. Oliver's recommendation that she receive an MRI. AC ¶¶ 34–35.

1.  *Plaintiffs' fraud claim is based on specific misstatements and not omissions.*

The Court should reject Defendants' improper attempts to reframe Plaintiffs' claims as involving omissions or a "fail[ure] to disclose to potential members that preauthorization may be required for certain covered services, such as the MRI that was ordered by Ms. Valentini's physician." Defs. MTD at 18. As detailed above, the marketing summary prepared by Defendants contained affirmative misstatements that were designed to, and did, convince Plaintiffs that choosing the Plan meant "the freedom to choose any provider worldwide," and that "[w]hen you need specialty care, you select the specialist and make the appointment. Payment for services will be made directly to the provider - you will not have to file a claim form when you use a GHI participating provider." AC ¶ 145.

These statements are misleading on their own, and even more misleading when read in context. As Defendants point out, the materials were prepared by Defendants to highlight relevant distinctions and influence Plaintiffs' choice between 11 health plans, with the different plan summaries presented on consecutive pages of the "booklet." (Ex. 73-1, 21-22) On page 21, the summary the GHI DC-37 Med-Team plan contains a clear statement that "diagnostic x-rays and certain other medical services require precertification." On the very next page, Defendants omit any reference to precertification being needed for x-rays or any other diagnostic test, and instead emphasize the Plan's "freedom to choose" and ability to "select the specialist and make the appointment" under the Plan. *Id*. at 22. Not only that, but the SPD references prior authorization and prior certification in two specific and very different contexts – brand name drugs and home care – neither of which has anything to do with MRIs or other diagnostic

testing. *Id.* at 22. The most reasonable reading of Defendants' statements then is that whatever precertification or prior authorization meant, under the Plan it applied only to brand name drugs and home health care – and not to specialist care or diagnostic testing. It is a stark contrast to the GHI DC 37 Med-Team description on the preceding page which clearly stated that "diagnostic - rays and certain other medical services require precertification." *Id.* at 21. And that is precisely how Plaintiffs understood that language, and a key reason why they chose the Plan over other options. AC ¶¶ 145; 152.

This juxtaposition and context show (1) that GHI knew full well that "precertification" or "preauthorization" or "prior authorization" requirements were an important consideration for readers; (2) that GHI could have and in some instances did include these aspects in their summary descriptions; and, most tellingly, that (3) GHI deliberately juxtaposed its false statements concerning the Plan with nearby statements concerning "precertification requirements" so that a reader comparing "the differences in benefits between the different type of health plans," (Defs. MTD at 8) be attracted to the GHI-CBP plan. Consumers would be particularly likely to read the representations that they could "choose any provider worldwide", and "select the specialist and make the appointment" as meaning the insurance company would not impose undisclosed obstacles to block access to that care.

The Defendants' misrepresentations in its online Summary of Benefits and Coverage (SBC) were no less egregious in their intent not just to confuse members but to mislead them. Defendants complain that "Plaintiffs' characterizations are grossly misleading" (*Id.* 10) because the Plaintiff's First Amended Complaint alleged that the SBC "makes absolutely no reference to any 'utilization review' procedure" and "does not say that prior authorization is required for an MRI." (Def's MTD at 10.) Defendants' rebuttal is to claim that the SBC includes a notation that "Page 2 of the SBC does, in fact, state specifically that '[p]re-certification' is required for MRIs."

(*Id.* at 11). Again, this language only serves to highlight Defendants' deliberately misleading use of multiple terms, which they now claim all mean the same thing. It is classic bait-and-switch: the SPD says nothing about pre-certification but it is slipped into the SBC.

Moreover, Defendants' fail to note that the Policy's only reference to precertification is to mental health benefits, and that it says nothing about precertification being needed for an MRI. One of the two documents must be right and the other wrong; and both reflect that Defendants made false statements in the marketing materials.

Notably, Defendants' misrepresentations in the SBC are not limited to the ones that relate specifically to Kathleen's treatment at issue in this case. The SBC also states on page 3: "If you have mental health, behavioral health, or substance abuse needs". And on the same page: "No prior approval required." That seems clear enough. But the Plan unequivocally contradicts that. On page 138 it states, "Mental health benefits continue to be subject to precertification."

In sum, the Amended Compliant identifies multiple affirmative misstatements. Accordingly, Defendants' arguments concerning the standards that apply in cases alleging fraud by omission, Defs. MTD at 18-19, have no relevance here and the Court should reject them. *See Minnie Rose LLC v. Yu*, 169 F. Supp. 3d 504, 519–21 (S.D.N.Y. 2016) ("defendants did not merely conceal a failure to invest plaintiff's money in accordance with the contract, they actively misrepresented how they invested plaintiff's money")

        2.        *The statements are false.*

Defendants' argument that the statements identified in Plaintiffs' amended complaint are not false is equally meritless. The marketing summary falsely told Plaintiffs that the Plan gave them "freedom to choose" among health care providers, and the right to "select the specialist and make the appointment." Ex. 73-1 at 22. Not only that, but the SPD references prior authorization and pre-certification in two very specific, limited contexts – brand name drugs and

home care.  Neither has anything to do with MRIs or any other diagnostic testing or specialist care. Read in context, these statements told Plaintiffs that for all other medical needs, the Plan would cover medical expenses without requiring prior authorization. And this reading is further buttressed by the fact that the GHI DC-37 Med-Team plan – on the immediately-preceding page, and also prepared by GHI – specifically flagged that "diagnostic x-rays and certain other medical services require precertification." *Id*. at 21. How else could a consumer trying to make an informed decision read the juxtaposed descriptions?  The Valentinis were weighing various plan attributes to make an informed decision: one plan required pre-certification and the other did not.

Defendants do not even argue that the Plan did, in fact, allow Kathleen to choose freely among health care providers or see specialists without interference from Defendants. Instead, Defendants rely on the fact that the marketing materials were only a summary and cannot be "reasonably read to suggest that it intends to describe all terms of the Policy." Defs. MTD at 20. But Plaintiffs do not argue that the marketing materials represented that there were no other terms in the Plan. Plaintiffs' point is that the actual terms of the Plan were the exact opposite of the representations made in the marketing materials. Plaintiffs allege that the SPD deliberately misrepresented the terms of the Plan, not that it failed to include certain aspects. Defendants cannot avoid fraud claims by lying in their marketing materials and then asserting that those statements are somehow not false because the Plan says something entirely different. Such differences only evidence the falsity of Defendants' statements in the marketing materials.

Defendants also argue that Plaintiffs' allegation that "Ms. Valentini was not provided with a copy of the full Plan 'when making a decision about their [sic] health insurance is plainly wrong." Defs. MTD at 20. The basis for this assertion apparently is a representation in the marketing materials that "actually promised that a fuller statement of the benefits was

forthcoming." *Id.* at 20. It is hard to follow the precise logic of Defendants' argument, but it clearly provides no basis for the case to be dismissed. On a motion to dismiss the Court accepts Plaintiffs' allegations as true, and the Amended Complaint alleges that Defendants did not provide a copy of the Plan. Defendants could not dispute that by submitting actual evidence that a Plan copy had been provided, and they certainly cannot dispute it by pointing to a statement in which Defendants – falsely, as it turned out – promised to provide a copy of the Plan. The Court should ignore this improper attempt to controvert Plaintiffs' factual allegations.

To the extent Defendants are arguing that there can be no false statement so long as the Defendants include some language suggesting that further details will be provided, that position is also wrong. Defendants overstate the holdings in cases such as *Woodhams v. Allstate Fire & Cas. Co.*, 748 F. Supp. 2d 211, 216 (S.D.N.Y. 2010), *aff'd*, 453 F. App'x 108 (2d Cir. 2012). *Woodhams* dismissed fraud allegations based on "a printout of a summary of Allstate's property insurance offerings taken from Allstate's website. The website states that Allstate's policies can cover repair or replacement costs, not to exceed 120% of applicable coverage limits, accompanied by a disclaimer that 'all coverages are subject to availability and qualifications. Other terms, conditions and exclusions apply .... Please read your Allstate policy for full coverage details.'" *Id.* The policy itself clarified that repair costs (as opposed to cash value replacements) would only be covered if the repairs were made within 180 days. *Id.* As noted above, the basis of Plaintiffs' fraud claim here is not that the Plan contained additional terms that were not disclosed in the marketing materials; it is that the Plan contained terms that were diametrically opposite to what was stated in the marketing materials, instead of the terms that were advertised. This is fraud. *See LBBW Luxemburg S.A. v. Wells Fargo Sec. LLC*, 10 F. Supp. 3d 504, 516 (S.D.N.Y. 2014) (holding that plaintiff had alleged a material misrepresentation even though defendants "disclosed that the market value of the collateral would fluctuate and [investors] assumed the risk of ordinary market

fluctuations" because "market fluctuation does not capture an instantaneous deliberate write-down of over 50 percent of the collateral's value at closing."). A disclaimer about "additional terms" is not a license to lie freely in marketing materials without fear of fraud claims.

3.       *Plaintiffs adequately allege scienter, including "fraudulent intent"*

"[I]ssues of intent and motive are typically factual inquiries" that should not be decided on a motion to dismiss "unless the nonmovant has failed to [allege] any evidence ... that the defendants acted with scienter." *LBBW Luxemburg S.A. v. Wells Fargo Sec. LLC*, 10 F. Supp. 3d 504, 517 (S.D.N.Y. 2014); *see also In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 693 (2d Cir. 2009) ("We are … 'lenient in allowing scienter issues to withstand summary judgment based on fairly tenuous inferences,' because such issues are 'appropriate for resolution by the trier of fact.' The same holds true for allowing such issues to survive motions to dismiss."); 10B Wright & Miller, Federal Practice and Procedure § 2730 (4th ed. 1998) ("Since the information relating to state of mind generally is within the exclusive knowledge of one of the litigants and can be evaluated only on the basis of circumstantial evidence, the other parties normally should have an opportunity to engage in discovery before a summary judgment is rendered.").

In addition, while New York courts recognize a scienter element to fraud claims, a plaintiff is not required to demonstrate intent to defraud to satisfy this element. *Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, 888 F. Supp. 2d 431, 444 (S.D.N.Y. 2012). "Instead, a plaintiff may meet the scienter requirement by showing evidence of conscious misbehavior or recklessness on the part of the defendant." *AFP Mfg. Corp. v. AFP Imaging Corp.*, No. 17 Civ. 03292 (NSR), 2018 WL 3329859, at *10 (S.D.N.Y. July 6, 2018). Further, "a false or clearly misleading statement can permit an inference of deceptive intent." *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 693 (2d Cir. 2009).

According to Defendants, the only allegations of fraudulent intent are "conclusory assertions of a 'generalized profit motive that could be imputed to any company." Defs. MTD at 21. In fact, the Amended Complaint pleads (1) clear misstatements that support an inference of fraudulent intent, as discussed above; as well as (2) multiple other instances in which defendants have engaged in similar misconduct, further confirming their bad faith and fraudulent intent. The Complaint even highlights recent rulings from the New York Court of Appeals and the Third Circuit concerning other deliberate misstatements made by <u>these exact same defendants in the same marketing materials</u>. And those decisions cite an investigation by the New York Attorney General – concerning marketing misrepresentations – which resulted in a multi-million dollar settlement and a promise by the Defendants to fix the misleading marketing materials. In addition, Defendants' use of a grab-bag of various different terms (precertification, prior authorization, utilization review, etc.) apparently to mean the exact same thing serves no purpose but to confuse the reader. This is further evidence that Defendants understood these factors were an important consideration to people evaluating the Plan; and that they took deliberate steps to conceal the truth about them. Each of these allegations is sufficient to allege scienter. Viewed in their totality they more than satisfy Rule 9(b).[8]

4.      *The amended complaint adequately pleads reliance*

"[B]ecause justifiable reliance 'involve[s] many factors to consider and balance, no single one of which is dispositive,' it is 'often a question of fact for the jury rather than a question of law

_____

[8] Plaintiffs' Complaint further details the pattern of fraudulent behavior documented by the Minnesota Hospital Association and the experiences suffered by Carolyn Daigle at Defendant eviCore's hands (Ms. Daigle was also improperly counseled away from an MRI by eviCore. The delay in diagnosing her tumor has permanently confined her to a wheelchair). AC ¶¶ 55–57. Defendants dismiss them as "speculative and conclusory," but they provide additional details about Defendants' fraudulent conspiracy. Together with other judicially-noticeable materials identified by Plaintiffs, these allegations satisfy Rule 9(b) specificity requirements and show far more than a "mere suspicion" that fraud occurred. *Cf.* Defs. MTD at 15 (citing *Inn Chu Trading Co. v. Sara Lee Corp.*, 810 F. Supp. 501, 507 (S.D.N.Y. 1992)).

for the court.'" *Woori Bank v. RBS Sec., Inc.*, 910 F. Supp. 2d 697, 701 (S.D.N.Y. 2012) (quoting *STMicroelectronics, N.V. v. Credit Suisse Securities (USA) LLC,* 648 F.3d 68, 81 (2d Cir. 2011).

Defendants ignore these authorities and argue that, as a matter of law, Plaintiffs could not have reasonably relied on any misstatements in the marketing materials. Defendants offer several reasons, none of which have merit.

First, Defendants cite *Musalli Factory For Gold & Jewellry v. JPMorgan Chase Bank, N.A.*, 261 F.R.D. 13, 20 (S.D.N.Y. 2009), *aff'd sub nom. Musalli Factory for Gold & Jewellry Co. v. JPMorgan Chase Bank, N.A.*, 382 F. App'x 107 (2d Cir. 2010) and argue that complaint somehow fails to "plausibly suggest that Plaintiffs would have enrolled in a different plan." Defs. MTD at 22. But *Musalli* does not support Defendants' position that this is a required element or that Plaintiffs have failed to plead it. In *Musalli* the plaintiffs' own allegations made clear they knew certain statements were false, and the Court concluded that if the plaintiffs knew the statements were false they could not reasonable have relied on them. *Id.* at 20 (plaintiff "cannot have relied on this statement because it knew the statement was false").[9] This has nothing to do with whether the Valentinis would have enrolled in a different plan, had they known Defendants' representations were false. In any event, the Plaintiffs here allege that they enrolled in the Plan based on Defendants' misrepresentations, and there is no suggestion that Plaintiffs knew those statements were fraudulent. Nothing more is required.

Next, Defendants argue that Plaintiffs could not have relied on misstatements in the marketing materials either (a) because Plaintiffs did not call the phone number provided for questions; or (b) because the Plan later became available online. This is simply a reframing of the

---

[9] *See also id.* at 21 (plaintiff could not have relied on any statement denying that it "had ever deposited funds" into a certain program, because the plaintiff "knew it had invested this money: it allegedly wired $2.05 million to the NYF Bank Account in August of 2004, another $1.9 million in July 2005, and finally an additional $1.05 million in August of 2005") (citations omitted)

same incorrect arguments discussed in the section on falsity above. No authority supports Defendants' view that they can absolve themselves of liability for fraudulent statements simply by providing "contact information to obtain further information," Defs. MTD at 22, or publishing a copy of the full Plan on a website somewhere at some point in time – indeed long after Plaintiffs had already relied on Defendants' misstatements in the marketing materials. Again, the authority Defendants rely on is inapposite. *Paraco Gas Corp. v. Travelers Cas. & Sur. Co. of Am.*, 51 F. Supp. 3d 379, 394 (S.D.N.Y. 2014) held that when a sophisticated business party signs an insurance contract, it is presumed to have read the documents. Therefore, it cannot assert fraud claims that are contradicted by the plain language of the contract it signed. *Id.* Plaintiffs here are not sophisticated business entities, and they did not sign any agreement with Defendants. Nothing about the holding or rationale of *Paraco* suggests Plaintiffs should have reviewed documents that were not even available to them and uncovered Defendants' fraud. Indeed, the Court of Appeals in *Plavin* concluded that while the underlying contract may have been negotiated by sophisticated parties, Defendants' behavior was consumer oriented (*i.e.* not between sophisticated business parties) and subject to New York's main consumer protection law: "GHI's alleged 'dissemination of information to' hundreds of thousands of City employees in order to solicit their selection of its plan 'is precisely the sort of consumer oriented conduct that is targeted by General Business Law §§ 349 and 350.'" *Plavin* at 12.

Defendants' creative but faulty arguments continue with the theory that Plaintiff failed to allege "detrimental" reliance because the complaint does not include facts "comparing the GHI Policy, with the preauthorization requirements or utilization review procedures of any of the other ten health benefits plans that were available." Defs. MTD at 22. No authority is cited in support of this proposition, which appears to confuse reliance with causation (another fact-intensive issue). *See In re Merrill Lynch & Co. Rsch. Reps. Sec. Litig.*, 568 F. Supp. 2d 349, 358

(S.D.N.Y. 2008) ("To plead transaction causation, which is akin to reliance, a plaintiff need only allege that "but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction.").

With regard to the causation element of a common law fraud claim, a complaint need only "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *King Cty., Wash. v. IKB Deutsche Industriebank AG*, 708 F. Supp. 2d 334, 338 (S.D.N.Y. 2010) (citation omitted). The complaint details exactly how Defendants' false statements and interference with Kathleen's medical treatment was connected to the harms she suffered: the marketing materials promised Kathleen that there were no roadblocks to getting appropriate care. Yet Defendants created the delays which resulted in the amputation of her leg, hip and pelvis. Defendants also argue that "Plaintiffs' factual theory of the case is fundamentally at odds with any claim that Ms. Valentini relied on any supported misstatements of fact connected to eviCore's initial denial of cover" because she "appealed the denial of coverage and won its reversal." Defs. MTD at 23. But the relevant reliance for purposes of the instant motion is Plaintiffs' reliance on Defendants' misstatements in choosing the Plan's health coverage. In any event, Defendants' latest attempt to replace Plaintiffs' allegations with their own version of the facts is obviously wrong – of course Kathleen relied on Defendants' false and inaccurate statements concerning the appropriate treatment plan for her symptoms. She had no choice, since they controlled her access to health care.

### C. The amended complaint contains sufficient detail concerning each Defendant's misconduct.

Defendants also argue that "the complaint should inform each defendant of the nature of his alleged participation in the fraud." *State Farm Mut. Auto. Ins. Co. v. James M. Liguori, M.D., P.C.*, 589 F. Supp. 2d 221, 228 (E.D.N.Y. 2008) (cited in Defs. MTD at 15). However, as Defendants'

own authority holds: "it is reasonable to assume that plaintiff could not list all [fraudulent statements] without some discovery on the issue [and] Rule 9(b) does not require that each specific misrepresentation be identified where an ongoing fraudulent scheme is alleged." *Id.* at 237 (holding that allegations satisfied Rule 9(b) even though "the time and place of each statement is not clearly stated for each fraudulent claim"). This is true here because, as alleged in the amended complaint, the Defendants use their names and logos interchangeably in their communications with Plaintiffs. AC ¶¶ 199. They cannot now shift the burden onto Plaintiff to uncover which of the entities named on the letterhead truly authored the documents or conceived of their fraudulent scheme. "It would be strange indeed to demand greater precision of Plaintiffs in pleading the author's identity than they received as readers of these documents." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 171–73 (2d Cir. 2015).

### D. The Complaint adequately alleges a conspiracy to commit fraud.

Plaintiffs have also sufficiently pleaded their civil conspiracy claim (10th cause of action). Civil conspiracy requires the plaintiff to allege "the primary tort, plus the following four elements: an agreement between two or more parties; an overt act in furtherance of the agreement; the parties' intentional participation in the furtherance of a plan or purpose; and resulting damage or injury." *Cohen Bros. Realty Corp. v. Mapes*, 181 A.D.3d 401, 404 (1st Dep't 2020).

Further, except as to the underlying fraud, "Plaintiffs' civil conspiracy claim … is subject to the more liberal pleading standard of Rule 8(a)." *Moon Joo Yu v. Premiere Power LLC*, 2015 WL 4629495, at *9 (S.D.N.Y. Aug. 4, 2015). The Complaint more than adequately alleges the nature and scope of Defendants' fraudulent conspiracy, as detailed below.

Plaintiff satisfies the elements necessary to plead a civil conspiracy. There was an agreement between two or more parties: EmblemHealth/GHI and eviCore. AC ¶ 3. There was an overt act in furtherance of the agreement: the alleged utilization review. *Id.* ¶¶ 3-4. The parties

intentionally participated in the furtherance of a plan or purpose: their negligent denial of the MRI on grounds that were entirely specious and refuted by the Defendants' own records, not just in Kathleen's case, but in multiple other instances. *Id.* ¶¶ 5, 55–57. And there was resulting damage or injury: the delayed diagnosis which necessitated the amputations. *Id.* ¶ 43.

Defendants' conspiracy is as obvious as it is abhorrent: it is first to induce members to select their health care plan by promising easy access to care; then to deny members diagnostic tests and medical procedures under the guise that they are not medically appropriate; then delay those tests and procedures in the hope that prescribing doctors don't have the necessary staff and time to comply with Defendants' bureaucracy and shifting goal-lines.

## IV.    Plaintiffs' derivative and punitive damages claims are viable.

Defendants do not challenge Plaintiffs' claims for bad faith/punitive damages, loss of services and loss of guidance to a minor child, other than to argue that "each of these claims is derivative and cannot exist independent of a viable primary cause of action." Def. MTD at 25. Because the primary claims are viable for the reasons set forth above, the Court should reject Defendants' motion to dismiss these claims as well.

## <u>CONCLUSION</u>

For all of the foregoing reasons, Defendants' motion to dismiss should be denied in its entirety.

Dated: September 13, 2021

**POLLOCK COHEN LLP**

By: _____/s/ Steve Cohen_____
        Steve Cohen
60 Broad St., 24th Floor
New York, NY 10004
Scohen@PollockCohen.com
Phone: (212) 337-5361

**MERSON LAW PLLC**

By: <u>    /s/ Jordan Merson</u>
      Jordan Merson
150 East 58th St.
New York, NY 10155
jmerson@mersonlaw.com
Phone: (212) 603-9100
*Counsel for Plaintiffs*